# EXHIBIT 1

1  Michael L. Kirby (50895)
   Jonathan A. Boynton (174910)
2  **POST KIRBY NOONAN & SWEAT LLP**
   One America Plaza
3  600 West Broadway, Suite 1100
   San Diego, California 92101-3387
4  Telephone (619) 231-8666
   Facsimile (619) 231-9593
5
   Daniel J. Mogin (95624)
6  Lisa J. Frisella (216504)
   Chad M. McManamy (225205)
7  **THE MOGIN LAW FIRM, P.C.**
8  110 Juniper Street
   San Diego, CA 92101-1502
9  Telephone: (619) 687-6611
   Facsimile: (619) 687-6610
10

11 Attorneys for Plaintiffs

FILED
05 JUL 27 PM 3:55
SOUTHERN DISTRICT OF CALIFORNIA
BY:                    DEPUTY

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUSTIN SUAREZ on behalf of himself and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>INTEL CORPORATION, a Delaware corporation,<br><br>Defendants. | CASE NO.<br><br>**CLASS ACTION COMPLAINT** |

Plaintiff Justin Suarez ("Plaintiff") brings this action individually and on behalf of all other individuals and/or entities ("persons") similarly situated. The Class that Plaintiff seeks to represent consists of all persons who indirectly purchased x86 microprocessor chips produced by Intel Corporation ("Intel") including end-products such as personal computers (PC) incorporating such microprocessors during the Class period, as defined below. Plaintiff, by its attorneys, complains of the Defendant, upon information and belief, except those paragraphs that allege personal knowledge as follows:

PKNS\381148.1

# INTRODUCTION

1. Pursuant to 28 U.S.C. section 1332 (d), Plaintiff brings this action as a Nationwide Class Action under California law on behalf of all "persons," as defined in California Business & Professional Code ("Cal. Bus. & Prof. Code") section 16702, who indirectly purchased Intel x86 microprocessor chips, including those who purchased end-products such as personal computers ("PC") containing such Intel microprocessor chips for their own use and not for re-sale, and a thereby paid artificially high supra-competitive prices as a result of Intel's anti-competitive conduct.

2. Intel holds a monopoly in microprocessors that run the Microsoft Windows and Linux families of operating systems (hereinafter the "x86 Microprocessor Market"). Intel possesses market power, with its microprocessor revenues accounting for approximately 90% of the worldwide total dollar of microprocessor sales (and 80% of the microprocessor units sold).

3. For over a decade, Intel has unlawfully maintained its x86 microprocessor monopoly by engaging in a relentless campaign to coerce customers to refrain from dealing with its competitors. Among other things,

- Intel has forced major customers into exclusive or near-exclusive deals;
- Intel has conditioned rebates, allowances, and market development funding on its customers' agreement to severely limit or forego entirely purchases from Intel's competitors;
- Intel has established a system of discriminatory, retroactive, first-dollar rebates triggered by purchases at such high levels as to have the practical and intended effect of denying its customers the freedom to purchase any significant volume of microprocessors from Intel's competitors;
- Intel has threatened retaliation against customers, particularly in strategic market segments;

///
///

PKNS\381148.1

1  • Intel has established and enforced quotas among key retailers effectively requiring them to stock overwhelmingly, if not exclusively, Intel-powered computers, thereby artificially limiting consumer choice;

• Intel has forced PC makers and technology partners to boycott Intel's competitors' product launches and promotions; and

• Intel has abused its market power by forcing on the industry technical standards and products in a manner which has, as its central purpose, the handicapping of its competitors in the marketplace.

4. End-users or consumers, including Plaintiff and the other members of the Class, have been damaged by Intel's unlawful conduct in the form of supra-competitive prices for personal computers and other products containing microprocessors resulting from Intel's raising and fixing of the prices of its microprocessor chips incorporated therein, and the loss of freedom to purchase computer products and other products that best fit their needs.

## JURISDICTION

5. This Court has jurisdiction pursuant to 28 U.S.C. section 1332(d), as the amount of controversy exceeds the sum or value of $5 million, exclusive of interest and costs, and there is a diversity of citizenship between Defendant and Members of the Class as the Class consists of persons of all 50 states.

## VENUE

6. Venue is proper in this Court pursuant to 28 U.S.C. section 1391(a) because Intel conducts business in San Diego County, is subject to personal jurisdiction in San Diego County, and the acts and transactions given rise to the violations complained of herein, and the Classes' damages, occurred in substantial part in this county. Venue is also proper pursuant to Cal. Bus. & Prof. Code section 16750(a) because Intel is found, or its agent resides or is found, in San Diego County, and service may be obtained there.

///

## PARTIES

7. Plaintiff Justin Suarez is a resident of San Diego, California who purchased a Dell Inspiron 8600 laptop computer in San Diego containing an Intel Centrino microprocessor chip in approximately March 2004, for his own use and not for re-sale, paying a supra-competitive price as a result of Intel's conduct as alleged herein and was thereby injured in his business or property.

8. Defendant Intel Corporation is a Delaware corporation with its principal place of business in Santa Clara, California. At all times relevant hereto, Intel was engaged, either individually or with others, in the business of manufacturing, marketing or selling Intel x86 Microprocessor Chips to the public throughout the United States and within the State of California.

## AGENCY, JOINT VENTURE, ALTER EGO AND CO-CONSPIRATORS

9. Intel acted as the agent, joint venturer, alter ego, or co-conspirator of or for the others both known and unknown, with respect to the acts, violations, and common course of conduct alleged herein.

10. The acts charged in this Complaint as having been accomplished by Defendant or its agents, joint venturers, alter egos, or co-conspirators were authorized, ordered, ratified or accomplished by their officers, agents, employees, or representatives, while actively engage in the management of the Defendant's business or affairs.

## CLASS ACTION ALLEGATIONS

11. Plaintiff brings this action as a class action, pursuant to Rules 23(a) and (b)(3) of the federal rules of Civil Procedure. The Class that Plaintiff seeks to represent is defined as:

> All persons residing in the United States who purchased Intel x86 microprocessor chips, indirectly from defendants, including end-products such as personal computers containing such Intel x86 microprocessor chips in the United States for their own use and not for resale from January 1, 1997, through the date of Class Notice (hereinafter "Class Period"). Specifically excluded from the

Plaintiff Class is the defendant herein; officers, directors, or employees of the defendant; any entity in which the defendant has a controlling interest; the affiliates, legal representatives, attorneys, heirs or assigns of the defendant. Also excluded are any federal, state or local governmental entities. Further excluded are and any judge, magistrate judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staffs.

12. Applying California law and, in particular, California's Cartwright Act, Cal. Bus. & Prof. Code §16700, et seq., to Intel's conduct in this matter on behalf of a Nationwide Class is neither arbitrary nor fundamentally unfair. Intel has its principal of place of business in California and the conduct described herein was directed from California. Moreover, one of the primary targets of Intel's anticompetitive practices, and its rival, AMD, who revealed Intel's anti-competitive conduct is also located in California. California is also the center of the PC industry in the United States and California consumers represent a disproportionately high percentage of the Plaintiff Class; it is believed that as much as 20-25% of all PC related transactions within United States take place, in substantial part, in California. As such, California has a significant state interest in applying its law to Intel's wrongful conduct. See Phillips Petroleum Co. v. Shutts, 472 U.S. 797 (1985).

### A. Numerosity

13. The Members of the Class are so numerous that joinder of all members is impracticable. Plaintiff is informed and believes, based upon the nature and amount of trade and commerce in x86 microprocessors, and thereon alleges that there are millions of Members of the Nationwide Class.

### B. Typicality

14. Plaintiff's claims are typical of the claims of the members of the Plaintiff Class because Plaintiff and each Member of the Plaintiff Class purchased, indirectly, Intel x86 microprocessor chips for their own use and not for resale, paying supra-competitive prices and suffering injury thereby as a result of Defendant's common course of conduct in violation of law as alleged herein.

### C. Adequacy of Representation

15. Plaintiff will fairly and adequately protect the interests of the members of the Plaintiff Class. Plaintiff resides in California, is an indirect purchasers and end-user of an Intel x86 microprocessor chip and indirectly purchased, in California, an Intel x86 microprocessor chip in a PC during the Class Period for his own use and not for resale, and thus is an adequate representative of the Plaintiff Class. Plaintiff has no interests that are adverse to the interests of absent class members. Plaintiffs have retained counsel with substantial experience in the prosecution of complex class action antitrust and consumer protection litigation.

### D. Superiority

16. A class action is superior to other available means for the fair and efficient adjudication of this controversy since individual joinder of all members of the Plaintiff Class is impracticable. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the monetary injuries suffered by each individual member of the class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for members to individually redress the wrongs done to them. Additionally, an important public interest will be served by addressing the matter as a class action. The cost to the court system of adjudication of such individualized litigation would be substantial. Individualized litigation would also present the potential for inconsistent or contradictory judgments.

### E. Manageability

17. Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action as plaintiff seeks the application of the law of a single state.

///

### F. Common Questions of Law and Facts

18. Common questions of law and fact exist with respect to all Members of the Class and predominate over any questions effecting solely individual members of the Class. Among the common questions or law and fact, are the following:

   (a) Whether defendant formed and operated an illegal trust in restraint of trade in x86 microprocessors within the Class Period;

   (b) Whether defendant unlawfully acquired or maintained or attempted to unlawfully acquire or maintain a monopoly in the production and sale of x86 microprocessors within the Class Period;

   (c) Whether defendant engaged in exclusive dealing sales or contracts, agreements or understandings that might substantially lessen competition or tend to create a monopoly in x86 microprocessor chips within the State of California and the United States within the Class Period;

   (d) The existence, duration, and illegality of the restrictions, limitations, obligations, conditions, agreements, understandings, trusts and course of conduct alleged herein;

   (e) Whether Plaintiff and the Plaintiff Class sustained antitrust injury as a result of defendant's conduct within the Class Period;

   (f) The appropriate amount and/or measure of damages; and

   (g) The appropriate nature of class wide equitable relief.

19. Further, Defendant has acted on grounds generally applicable to the entire Class, thereby making final injunctive relief and ancillary equitable relief appropriate with respect to the Class as a whole.

### FACTUAL BACKGROUND

20. Intel's largest competitor, AMD, set forth much of the history and anticompetitive conduct by Intel in its complaint filed on or about June 27, 2005:

///

///

*Early History*

21. The brain of every computer is a general-purpose microprocessor, an integrated circuit capable of executing a menu of instructions and performing requested mathematical computations at very high speed. Microprocessors are defined by their instruction set – the repertoire of machine language instructions that a computer follows. So, too are computer operating systems – software programs that perform the instructions in the set allowing the computer to perform meaningful tasks. The first generation of microprocessors, which were capable of simultaneously handling 4 and then later 8 bits of data, evolved to provide 16-bit capability (the original DOS processors), then sometime later a 32-bit capability (allowing the use of advanced graphical interfaces such as later versions of the Microsoft Windows operating system), and now 64-bit capability.

22. When IBM defined the original PC standards in the early 1980s, it had available to it a variety of microprocessors, each with its own instruction set. Among those where microprocessors developed by Motorola, Zilog, National Semiconductor, Fairchild, Intel, and AMD. IBM opted for the Intel architecture, which utilized what became known as the x86 instruction set (after Intel's naming convention for its processors, i.e., 8086, 80186, 80286, 80386), and a compatible operating system offered by Microsoft, known as DOS.

23. Unwilling to be consigned to a single source of supply, however, IBM demanded that Intel contract with another integrated circuit company and license it to manufacture the x86 chips as a second source. AMD, which had worked with Intel before in supplying microprocessors, agreed to abandon its own, competing architecture, and undertook to manufacture x86 chips as a second source of supply for IBM. Assured that it would not be dependent upon a monopoly supplier of x86 chips, IBM introduced the PC in August 1981 – and its sales of those computers exploded.

///

PKNS\381148.1

24. Although an arbitrator later found that "AMD's sponsorship helped propel Intel from the chorus line of semiconductor companies into instant stardom," Intel soon set out to torpedo the 1982 AMD-Intel Technology Exchange Agreement (the "Agreement") by which each would serve as a second source for products developed by the other. For example, Intel was required by the Agreement to send AMD timely updates of its second generation 80286 chip. Instead, in a "deliberate" effort "to shackle AMD's progress," Intel sent AMD information "deliberately incomplete, deliberately indecipherable and deliberately unusable by AMD engineers," according to the arbitrator. The conduct was, in the arbitrator's words, "inexcusable and unworthy." Moreover, this conduct was not isolated. Intel elsewhere tried to "sabotage" AMD products, engaged in "corporate extortion" and demonstrated a near-malevolent determination "to use all of its economic force and power on a smaller competitor to have its way."

25. In 1984, in another underhanded effort to stifle AMD's business, Intel decided that notwithstanding the Agreement, Intel would become the sole source for the promising 80386 chip. To fully realize its objective, Intel engaged in a scheme to mislead AMD and the public into erroneously believing that AMD would be a second source for this chip product, thereby keeping AMD in the Intel "competitive camp" for years.

26. This strategy served a broader purpose than simply preventing AMD from competing with Intel. Customers' perception that AMD would continue to serve as Intel's authorized second source was essential to Intel's aim of entrenching the x86 family of microprocessors as the industry standard — just as it had been essential to IBM's original introduction of the PC. Intel was well aware that if computer manufacturers knew Intel intended to sole source its 32-bit product, they would be motivated to select alternative products produced by companies offering second sources. Intel could not preserve the appearance that AMD would second source the 386 if it terminated the contract or otherwise disclosed its actual intent. Thus, Intel

PKNS\381148.1

stalled negotiations over product exchanges, while at the same time allowing AMD to believe that it could ultimately obtain the 386. This injured competition by deterring and impeding serious competitive challenges to Intel and directly injured AMD by depriving it of the revenues and profits it would have earned from such a challenge.

27. Intel implemented this secret plan for the purpose of acquiring and maintaining an illegal monopoly in the x 86 lines of microprocessors, which it did by at least 1987. As was its plan, Intel's conduct drained AMD's resources, delayed AMD's ability to reverse-engineer or otherwise develop and manufacture competitive products, and deterred AMD from pursuing relationships with other firms. In so doing, Intel wrongfully secured the benefit of AMD's marketing skills and talent in support of the x 86 lines of microprocessors and related peripherals and secured the benefit of substantial competitively sensitive AMD information regarding its product development plans. When AMD petitioned to compel arbitration in 1987 for Intel's beach and bad faith, the arbitrator took notice of Intel's anticompetitive design: "In fact, it is no fantasy that Intel wanted to blunt AMD's effectiveness in the microprocessor marketplace, to effectively remove AMD as at competitor."

28. In 1992, after five years of litigation, the arbitrator awarded AMD more than $10 million in damages, prejudgment interest, and a permanent, nonexclusive and royalty-free license to any Intel intellectual property embodied in AMD's own 386 microprocessor, including the x86 instruction set. Confirmation of the award was upheld by the California Supreme Court two years later. In bringing the litigation to a close, the arbitrator hoped that by his decision, "the competition sure to follow will be beneficial to the parties through an expanded market with appropriate profit margins and to the consumer worldwide through lower prices."

**AMD Moves From Second Source To Innovator**

29. Shortly after confirmation of the award, AMD settled its outstanding disputes with Intel in a 1995 agreement which gave AMD a shared interest in the x86 instruction set, but required AMD to develop its own architecture to implement those

instructions. The settlement also had the unintended benefit of forcing AMD to reinvent itself. Beginning in the late 1990s, AMD committed its resources to innovation and differentiation. Going its own way proved beneficial: AMD's first x86 chip without Intel pin-compatibility, the Athlon microprocessor, delivered in 1999, marked the first (but not last) time AMD was to leapfrog Intel technologically and beat it to market with a new generation Windows microprocessor (and to break the I GHz speed barrier in the process).

30. Four years later, AMD introduced an extension of x86 architecture that took Windows processors into the realm of 64-bit computing. Unlike Intel, which invested billions in its Itanium microprocessor and a new, unique 64-bit proprietary instruction set (which, because it was proprietary, would have been a game-ending development for AMD had it become the industry standard), AMD undertook to supplement the x86 instructions to accommodate 64-bit processing while allowing 32-bit software to be run as well. AMD's efforts culminated in April 2003 when it brought to market its Opteron microprocessor for servers (the workhorse computers used by businesses to run corporate networks, e-commerce websites, and other high-end, computationally-intense applications). Opteron was the industry's first x86 backward compatible 64-bit chip. Six months later, AMD launched the Athlon64, a backward compatible 64-bit microprocessor for desktops and mobile computers.

31. The computing industry hailed AMD's introduction of 64-bit computing as an engineering triumph. Said Infoworld its August 27, 2004 issue,

> You just gotta love a Cinderella story. . . . AMD's rapid rise from startup to $5 billion semiconductor powerhouse is, as Humphrey Bogart's English teacher once said, the stuff of which dreams are made. . . . In the process, AMD has become known as the company that kept Intel honest, the Linux of the semiconductor world. . . . After decades of aping Intel architectures, the AMD64 architecture, rooted in Opteron and Athlon 64 processors, has actually been imitated by Intel in the form of Nocona, Intel's 64-bit version of Xeon. In a stunning reversal of fortune, Intel was forced to build that chip because Opteron was invading a server market that the Intel titanium was supposed to dominate.

32. In what represented a paradigm shift in the microprocessor world, Microsoft endorsed AMD's 64-bit instruction set and announced that Windows would support it. As noted by InfoWorld, Intel then copied AMD's technology for its own 64-bit offerings — an event that confirmed AMD's technological emergence.

33. AMD has since extended its AMD64 technology to the balance of AMD's microprocessor line-up (which now includes AMD Athlon 64, AMD Athlon 64 FX, Mobile, AMD Athlon 64, AMD Sempron, and AMD Turion64 products). Owing also to AMD's innovations in dual-core processors and its introduction of an improved architecture that speeds up microprocessor communications with memory and input/output devices, AMD has advanced as a technological leader in the microprocessor industry. Its innovation has won for it over 70 technology leadership and industry awards and, in April 2005, the achievement of being named Processor Company of 2005" at, an Intel-sponsored industry awards show.

34. Tellingly, however. AMD's market share has not kept pace with its technical leadership. Intel's misconduct is the reason. Intel has unlawfully maintained its monopoly and has systematically excluded AMD and other competitors from any meaningful opportunity to compete for market share by preventing the companies that buy chips and build computers from freely deploying processors sold by AMD and other competitors; by relegating AMD and other competitors to the low-end of the market; by preventing AMD and other competitors from achieving the minimum scale necessary to become a full-fledged, competitive alternative to Intel; and by erecting impediments to competitors' ability to increase productive capacity for the next generation of microprocessors.

35. In addition to AMD, no other chip manufacturer has been able to successfully compete with Intel as a result of its anti-competitive acts as described herein.

///

///

PKNS\381148.1

## THE x86 PROCESSOR INDUSTRY

*Competitive Landscape*

36. The x86 versions of Windows and Linux, the two operating systems that dominate the business and consumer computer worlds, have spawned a huge installed base of Windows- and Linux-compatible application programs that can only run on the x86 instruction set. This has given Intel effective ownership of personal computing. Although other microprocessors are offered for sale, the non-x86 microprocessors are not reasonably interchangeable with x86 microprocessors because none can run the x86 Windows or Linux operating systems or the application software written for them.

37. The relevant product market is x86 Microprocessors, because a putative monopolist in this market would be able to raise the prices of x86 Microprocessors above a competitive level without losing so many customers to other microprocessors as to make this impractical. While existing end-users can theoretically shift to other operating-system platforms, high switching costs associated with replacing existing hardware and software make this impractical. Further, the number of new, first-time users who could choose a different operating-system platform is too small to prevent an x86 Microprocessor Chip monopolist from imposing a meaningful price increase for a non-transitory period of time. Computer manufacturers would also encounter high switching costs in moving from x86 Microprocessor Chips to other architectures and no major computer maker has ever done it. In short, demand is not cross-elastic between x86 Microprocessor Chips and other microprocessors at the competitive level.

38. The relevant geographic market for x86 microprocessors is essentially worldwide. Intel and its competitors compete globally; PC platform architecture is the same from country to country; microprocessors can be, and frequently are, easily and inexpensively shipped around the world; and the potential for arbitrage prevents chipmakers from pricing processors differently in one country than another.

PKNS\381148.1

39. Intel dominates the worldwide x86 Microprocessor Market. According to published reports, over the past several years, Intel has consistently achieved more than a 90% market share measured by revenue, while AMD's revenue share has remained at approximately 9%, with all other microprocessor manufacturers relegated to approximately 1%. Intel has captured at least 80% of x86 Microprocessor Chips sales in seven of the last eight years. Since 1999, AMD's worldwide volume share has hovered at 15%, only once penetrating the 20% level. The following chart illustrative:

### x86 Worldwide CPU Unit Market Share

|        | 1997  | 1998  | 1999  | 2000   | 2001  | 2002  | 2003  | 2004  |
|--------|-------|-------|-------|--------|-------|-------|-------|-------|
| Intel  | 85.0% | 80.3% | 82.2% | 82.2%  | 78.7% | 83.6% | 82.8% | 82.5% |
| AMD    | 7.3%  | 11.9% | 13.6% | 12.6.% | 20.2% | 14.9% | 15.5% | 15.8% |
| Others | 7.5%  | 7.9%  | 4.2%  | 1.1.%  | 1.1%  | 1.4%  | 1.7%  | 1.7%  |

40. Intel's x86 family of microprocessors no longer faces any meaningful competition other than from AMD. National Semiconductor acquired Cyrix in 1997 but shuttered it less than two years later. At the beginning of this year only two other x86 chip makers remained - Via Technologies, Inc. and Transmeta Corporation – which together account for less than 2% of the market. Transmeta has since announced its intention to cease selling x86 microprocessors, and Via faces dim prospects of growing its market share to a sustainable level.

**Customers For x86 Microprocessors**

41. Intel is shielded from new competition by huge barriers to entry. A chip fabrication plant ("fab") capable of efficiently mass-producing x86 microprocessors carries a price tag of at least $2.5 to $3.0 billion. In addition, any new market entrant would need the financial wherewithal to underwrite billions more in research and development costs to design a competing x86 microprocessor and to overcome almost insurmountable IP and knowledge barriers.

///

42. Annual worldwide consumption of x86 Microprocessor Chips currently stands at just over 200 million units per year and is expected to grow by 50% over the remainder of the decade. Relatively few microprocessors are sold for server and workstation applications (8.75 million in 2004), but these command the highest prices. Most x86 Microprocessor Chips are used in desktop PCs and mobile PCs, with desktops currently outnumbering mobiles by a margin of three to one. Of the total worldwide production of computers powered by x86 Microprocessor Chips, 32% are sold to U.S. consumers: U.S. sales of AMD-powered computers account for 29% of AMD's production; California accounts for as much as 20-25% of end-users.

43. The majority of x86 Microprocessor Chips are sold to a handful of large OEMs (original equipment manufacturers), highly visible companies recognized throughout the world as the leading computer makers. Regarded by the industry as "Tier One" OEMs over most product categories are: Hewlett-Packard ("HP"), which now also owns Compaq Computer; Dell, Inc.; IBM, which as of May 1, 2005, sold its PC (but not server) business to Lenovo; Gateway/eMachines; and Fujitsu/Fujitsu Siemens, the latter a Europe-based joint venture. Toshiba, Acer, NEC and Sony are also commonly viewed as Tier One OEMs in the notebook segment of the PC market. HP and Dell are the dominant players, collectively accounting for over 30% of worldwide desktop and mobile sales, and almost 60% of worldwide server sales. Both are U.S.-based companies, as are IBM and Gateway/eMachines; and all but Gateway have U.S. manufacturing operations (as does Sony, which operates a North American production facility in San Diego).

44. Worldwide, the Tier One OEMs collectively account for almost 80% of servers and workstations (specialty high-powered desktops), more than 40% of worldwide desktop PCs, and over 80% of worldwide mobile PC's. According to industry publications, unit market share in 2004 among the Tier One OEMs was as follows:

///

| | CEM Market shares – 2004 | | |
|---|---|---|---|
| Company | Server/WS | Desktop | Mobile |
| Hewlett-Packard | 29.86% | 13.69% | 16.23% |
| Dell | 28.34% | 16.18% | 17.27% |
| IBM/Lenovo | 14.46% | 3.69% | 9.20% |
| Fujitsu/Siemens | 3.70% | 2.83% | 6.88% |
| Acer | 0.81% | 1.85% | 8.53% |
| Toshiba | 0.31% | 0.05% | 12.73% |
| NEC | 2.06% | 2.02% | 4.50% |
| Sony | -- | 0.76% | 4.23% |
| Gateway/eMachines | 0.16% | 2.48% | 1.45% |
| Total | 79.70% | 43.55% | 81.02% |

45. The balance of x86 production is sold to smaller system builders and to independent distributors. The latter, in turn, sell to smaller OEMs, regional computer assemblers, value-added resellers, and other, smaller distributors.

46. OEMs have adopted a variety of business models, including direct sales to customers through web-based e-commerce, sales through company-employed sales staffs (who target IT professionals and Fortune 1000 companies) and sales through a network of independent distributors (who focus on smaller business customers). With the exception of Dell, which markets to consumers only directly (mostly over the Internet), most OEMs also sell their products through retail chains. Intel and its competitors compete not only to have OEMs incorporate their microprocessors into their retail platforms but also to convince retailers to allocate shelf-space so that the platforms containing their respective microprocessors can be purchased in the retailers' stores.

47. Through its economic muscle and relentless marketing – principally its "Intel Inside" and "Centrino" programs, which financially reward OEMs for branding their PCs as Intel machines – Intel has transformed the OEM world. While once

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

innovative companies themselves, the OEMs have largely become undifferentiated distributors of the Intel platform, offering "Intel Inside" and "Centrino" computers largely indistinguishable from those of their rivals. As their products have become commoditized, the Tier One OEMs operate on small or negative margins and the overwhelming portion of PC profit flows to Intel.

48. This profit drain has left OEMs and others in the distribution chain in a quarter-to-quarter struggle to eke out even a modest return on their assets, thereby making them continually susceptible to Intel's economic coercion, which is described below.

### INTEL'S UNLAWFUL PRACTICES

49. Intel has maintained its x86 microprocessor monopoly by deploying a host of financial and other exclusionary business strategies that in effect limit its customers' ability or incentive to deal with Intel's competitors. Although differing from customer to customer and segment to segment, the Intel arsenal includes direct payments in return for exclusivity and near-exclusivity; discriminatory rebates, discounts and subsidies conditioned on customer "loyalty" that have the practical and intended effect of creating exclusive or near-exclusive dealing arrangements; threats of economic retaliation against those who give, or even contemplate giving, too much of their business to Intel's competitors; and misuse of industry standards-setting processes so as to disadvantage competitors' products in the marketplace, thus increasing costs to consumers of x86 Microprocessor Chips and products containing such chips – including those purchased by Plaintiff and the other members of the Class.

50. Intel's has targeted both U.S. and offshore customers at all levels to prevent competitors from building market share anywhere, with the goal of stifling competitors and keeping Intel's customers dependent on Intel for very substantial amounts of product. In this way, OEMs remain vulnerable to continual threats of Intel retaliation, competitors remain capacity-constrained, the OEMs remain Intel-

dependent, and Intel thereby perpetuates its economic hold over them, allowing it to continue to demand that customers curtail their dealings with competitors. The cycle repeats itself: by unlawfully exploiting its existing market share, Intel impedes the growth of competitors, thereby laying a foundation for the next round of foreclosing actions with the effect that competitors' ability to benefit from their current technological advances is curtailed to the harm of consumers – including Plaintiff and the other members of the Class.

### 1) Practices Directed At OEMs

#### a. Exclusive and Near-Exclusive Deals

51. **Dell.** In its history, Dell has not purchased a single AMD x86 Microprocessor Chip despite acknowledging Intel's shortcomings and customers' requests for AMD solutions, principally in the server sector. As Dell's President and CEO, Kevin Rollins, publicly stated in February 2005:

> Whenever one of our partners slips on either the economics or technology, that causes us great concern. . . . For a while, Intel admittedly slipped technologically and AMD had made a step forward. We were seeing that in customer response and requests.

52. Nonetheless, Dell has been and remains Intel-exclusive. According to industry reports, Intel has secured Dell's exclusivity with outright payments and favorable discriminatory pricing and service. In discussions about buying from AMD, Dell executives have conceded that they must financially account for Intel retribution in negotiating pricing from AMD.

53. **Sony.** With the introduction of its Athlon microprocessor in 1999, AMD began to make notable inroads into Intel's sales to major Japanese OEMs, which export PCs internationally including into California and the U.S. By the end of 2002, AMD had achieved an overall market share of approximately 22% to the major Japanese OEMs. To reverse the erosion of its business, in 2003 Intel paid Sony multi-million dollar sums, disguised as discounts and promotional support, in exchange for absolute microprocessor exclusivity. Sony abruptly cancelled an AMD

PKNS\381148.1

-18-