# EXHIBIT 1

Michael L. Kirby (50895)
Jonathan A. Boynton (174910)
**POST KIRBY NOONAN & SWEAT LLP**
One America Plaza
600 West Broadway, Suite 1100
San Diego, California 92101-3387
Telephone (619) 231-8666
Facsimile (619) 231-9593

Daniel J. Mogin (95624)
Lisa J. Frisella (216504)
Chad M. McManamy (225205)
**THE MOGIN LAW FIRM, P.C.**
110 Juniper Street
San Diego, CA 92101-1502
Telephone: (619) 687-6611
Facsimile: (619) 687-6610

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUSTIN SUAREZ on behalf of himself and all others similarly situated, | CASE NO. |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| vs. | |
| INTEL CORPORATION, a Delaware corporation, | |
| Defendants. | |

Plaintiff Justin Suarez ("Plaintiff") brings this action individually and on behalf of all other individuals and/or entities ("persons") similarly situated. The Class that Plaintiff seeks to represent consists of all persons who indirectly purchased x86 microprocessor chips produced by Intel Corporation ("Intel") including end-products such as personal computers (PC) incorporating such microprocessors during the Class period, as defined below, Plaintiff, by its attorneys, complains of the Defendant, upon information and belief, except those paragraphs that allege personal knowledge as follows:

PKNS\381148.1

1

## INTRODUCTION

2      1.     Pursuant to 28 U.S.C. section1332 (d), Plaintiff brings this action as a

3 Nationwide Class Action under California law on behalf of all "persons," as defined in

4 California Business & Professional Code ("Cal. Bus. & Prof. Code") section 16702,

5 who indirectly purchased Intel x86 microprocessor chips, including those who

6 purchased end-products such as personal computers ("PC") containing such Intel

7 microprocessor chips for their own use and not for re-sale, and a thereby paid

8 artificially high supra-competitive prices as a result of Intel's anti-competitive conduct.

9      2.     Intel holds a monopoly in microprocessors that run the Microsoft

10 Windows and Linux families of operating systems (hereinafter the "x86

11 Microprocessor Market"). Intel possesses market power, with its microprocessor

12 revenues accounting for approximately 90% of the worldwide total dollar of

13 microprocessor sales (and 80% of the microprocessor units sold).

14      3.     For over a decade, Intel has unlawfully maintained its x86

15 microprocessor monopoly by engaging in a relentless campaign to coerce customers

16 to refrain from dealing with its competitors. Among other things,

17      •     Intel has forced major customers into exclusive or near-exclusive deals;

18      •     Intel has conditioned rebates, allowances, and market development

19 funding on its customers' agreement to severely limit or forego entirely purchases

20 from Intel's competitors;

21      •     Intel has established a system of discriminatory, retroactive, first-dollar

22 rebates triggered by purchases at such high levels as to have the practical and

23 intended effect of denying its customers the freedom to purchase any significant

24 volume of microprocessors from Intel's competitors;

25      •     Intel has threatened retaliation against customers, particularly in

26 strategic market segments;

27 /// 

28 /// 

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

1        •        Intel has established and enforced quotas among key retailers effectively
2    requiring them to stock overwhelmingly, if not exclusively, Intel-powered computers,
3    thereby artificially limiting consumer choice;

4        •        Intel has forced PC makers and technology partners to boycott Intel's
5    competitors' product launches and promotions; and

6        •        Intel has abused its market power by forcing on the industry technical
7    standards and products in a manner which has, as its central purpose, the
8    handicapping of its competitors in the marketplace.

9        4.        End-users or consumers, including Plaintiff and the other members of
10    the Class, have been damaged by Intel's unlawful conduct in the form of supra-
11    competitive prices for personal computers and other products containing
12    microprocessors resulting from Intel's raising and fixing of the prices of its
13    microprocessor chips incorporated therein, and the loss of freedom to purchase
14    computer products and other products that best fit their needs.

15                                **JURISDICTION**

16        5.        This Court has jurisdiction pursuant to 28 U.S.C. section 1332(d), as the
17    amount of controversy exceeds the sum or value of $5 million, exclusive of interest
18    and costs, and there is a diversity of citizenship between Defendant and Members of
19    the Class as the Class consists of persons of all 50 states.

20                                    **VENUE**

21        6.        Venue is proper in this Court pursuant to 28 U.S.C. section 1391(a)
22    because Intel conducts business in San Diego County, is subject to personal
23    jurisdiction in San Diego County, and the acts and transactions given rise to the
24    violations complained of herein, and the Classes' damages, occurred in substantial
25    part in this county.  Venue is also proper pursuant to Cal. Bus. & Prof. Code section
26    16750(a) because Intel is found, or its agent resides or is found, in San Diego County,
27    and service may be obtained there.

28    ///

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

PKNS\381148.1

1                                   **PARTIES**

2        7.      Plaintiff Justin Suarez is a resident of San Diego, California who

3   purchased a Dell Inspiron 8600 laptop computer in San Diego containing an Intel

4   Centrino microprocessor chip in approximately March 2004, for his own use and not

5   for re-sale, paying a supra-competitive price as a result of Intel's conduct as alleged

6   herein and was thereby injured in his business or property.

7        8.      Defendant Intel Corporation is a Delaware corporation with its principal

8   place of business in Santa Clara, California.  At all times relevant hereto, Intel was

9   engaged, either individually or with others, in the business of manufacturing,

10  marketing or selling Intel x86 Microprocessor Chips to the public throughout the

11  United States and within the State of California.

12          **AGENCY, JOINT VENTURE, ALTER EGO AND CO-CONSPIRATORS**

13       9.      Intel acted as the agent, joint venturer, alter ego, or co-conspirator of or

14  for the others both known and unknown, with respect to the acts, violations, and

15  common course of conduct alleged herein.

16       10.     The acts charged in this Complaint as having been accomplished by

17  Defendant or its agents, joint venturers, alter egos, or co-conspirators were

18  authorized, ordered, ratified or accomplished by their officers, agents, employees, or

19  representatives, while actively engage in the management of the Defendant's

20  business or affairs.

21                      **CLASS ACTION ALLEGATIONS**

22       11.     Plaintiff brings this action as a class action, pursuant to Rules 23(a) and

23  (b) (3) of the federal rules of Civil Procedure.  The Class that Plaintiff seeks to

24  represent is defined as:

25                  All persons residing in the United States who purchased
                    Intel x86 microprocessor chips, indirectly from defendants,
26                  including end-products such as personal computers
                    containing such Intel x86 microprocessor chips in the
27                  United States for their own use and not for resale from
                    January 1, 1997, through the date of Class Notice
28                  (hereinafter "Class Period").  Specifically excluded from the

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

1    Plaintiff Class is the defendant herein; officers, directors, or
2    employees of the defendant; any entity in which the
     defendant has a controlling interest; the affiliates, legal
3    representatives, attorneys, heirs or assigns of the
     defendant. Also excluded are any federal, state or local
4    governmental entities. Further excluded are and any judge,
     magistrate judge, justice, or judicial officer presiding over
5    this matter and the members of their immediate families
     and judicial staffs.

6    12.    Applying California law and, in particular, California's Cartwright Act, Cal.

7    Bus. & Prof. Code §16700, et seq., to Intel's conduct in this matter on behalf of a

8    Nationwide Class is neither arbitrary nor fundamentally unfair. Intel has its principal

9    of place of business in California and the conduct described herein was directed from

10   California. Moreover, one of the primary targets of Intel's anticompetitive practices,

11   and its rival, AMD, who revealed Intel's anti-competitive conduct is also located in

12   California. California is also the center of the PC industry in the United States and

13   California consumers represent a disproportionately high percentage of the Plaintiff

14   Class; it is believed that as much as 20-25% of all PC related transactions within

15   United States take place, in substantial part, in California. As such, California has a

16   significant state interest in applying its law to Intel's wrongful conduct. See Phillips

17   Petroleum Co. v. Shutts, 472 U.S. 797 (1985).

### A. Numerosity

19   13.    The Members of the Class are so numerous that joinder of all members

20   is impracticable. Plaintiff is informed and believes, based upon the nature and

21   amount of trade and commerce in x86 microprocessors, and thereon alleges that

22   there are millions of Members of the Nationwide Class.

### B. Typicality

24   14.    Plaintiff's claims are typical of the claims of the members of the Plaintiff

25   Class because Plaintiff and each Member of the Plaintiff Class purchased, indirectly,

26   Intel x86 microprocessor chips for their own use and not for resale, paying supra-

27   competitive prices and suffering injury thereby as a result of Defendant's common

28   course of conduct in violation of law as alleged herein.

### C. Adequacy of Representation

15.    Plaintiff will fairly and adequately protect the interests of the members of the Plaintiff Class. Plaintiff resides in California, is an indirect purchasers and end-user of an Intel x86 microprocessor chip and indirectly purchased, in California, an Intel x86 microprocessor chip in a PC during the Class Period for his own use and not for resale, and thus is an adequate representative of the Plaintiff Class. Plaintiff has no interests that are adverse to the interests of absent class members. Plaintiffs have retained counsel with substantial experience in the prosecution of complex class action antitrust and consumer protection litigation.

### D. Superiority

16.    A class action is superior to other available means for the fair and efficient adjudication of this controversy since individual joinder of all members of the Plaintiff Class is impracticable. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the monetary injuries suffered by each individual member of the class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for members to individually redress the wrongs done to them. Additionally, an important public interest will be served by addressing the matter as a class action. The cost to the court system of adjudication of such individualized litigation would be substantial. Individualized litigation would also present the potential for inconsistent or contradictory judgments.

### E. Manageability

17.    Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action as plaintiff seeks the application of the law of a single state.

///

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

### F. Common Questions of Law and Facts

18.    Common questions of law and fact exist with respect to all Members of the Class and predominate over any questions effecting solely individual members of the Class. Among the common questions or law and fact, are the following:

(a)    Whether defendant formed and operated an illegal trust in restraint of trade in x86 microprocessors within the Class Period;

(b)    Whether defendant unlawfully acquired or maintained or attempted to unlawfully acquire or maintain a monopoly in the production and sale of x86 microprocessors within the Class Period;

(c)    Whether defendant engaged in exclusive dealing sales or contracts, agreements or understandings that might substantially lessen competition or tend to create a monopoly in x86 microprocessor chips within the State of California and the United States within the Class Period;

(d)    The existence, duration, and illegality of the restrictions, limitations, obligations, conditions, agreements, understandings, trusts and course of conduct alleged herein;

(e)    Whether Plaintiff and the Plaintiff Class sustained antitrust injury as a result of defendant's conduct within the Class Period;

(f)    The appropriate amount and/or measure of damages; and

(g)    The appropriate nature of class wide equitable relief.

19.    Further, Defendant has acted on grounds generally applicable to the entire Class, thereby making final injunctive relief and ancillary equitable relief appropriate with respect to the Class as a whole.

### FACTUAL BACKGROUND

20.    Intel's largest competitor, AMD, set forth much of the history and anticompetitive conduct by Intel in its complaint filed on or about June 27, 2005:

/ / /

/ / /

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

1  *Early History*

2        21.    The brain of every computer is a general-purpose microprocessor, an

3  integrated circuit capable of executing a menu of instructions and performing

4  requested mathematical computations at very high speed.  Microprocessors are

5  defined by their instruction set – the repertoire of machine language instructions that

6  a computer follows.  So, too are computer operating systems – software programs

7  that perform the instructions in the set allowing the computer to perform meaningful

8  tasks.  The first generation of microprocessors, which were capable of simultaneously

9  handling 4 and then later 8 bits of data, evolved to provide 16-bit capability (the

10  original DOS processors), then sometime later a 32-bit capability (allowing the use of

11  advanced graphical interfaces such as later versions of the Microsoft Windows

12  operating system), and now 64-bit capability.

13        22.    When IBM defined the original PC standards in the early 1980s, it had

14  available to it a variety of microprocessors, each with its own instruction set.  Among

15  those where microprocessors developed by Motorola, Zilog, National Semiconductor,

16  Fairchild, Intel, and AMD.  IBM opted for the Intel architecture, which utilized what

17  became known as the x86 instruction set (after Intel's naming convention for its

18  processors, i.e., 8086, 80186, 80286, 80386), and a compatible operating system

19  offered by Microsoft, known as DOS.

20        23.    Unwilling to be consigned to a single source of supply, however, IBM

21  demanded that Intel contract with another integrated circuit company and license it to

22  manufacture the x86 chips as a second source.  AMD, which had worked with Intel

23  before in supplying microprocessors, agreed to abandon its own, competing

24  architecture, and undertook to manufacture x86 chips as a second source of supply

25  for IBM.  Assured that it would not be dependent upon a monopoly supplier of x86

26  chips, IBM introduced the PC in August 1981 – and its sales of those computers

27  exploded.

28  / / /

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

24.     Although an arbitrator later found that "AMD's sponsorship helped propel Intel from the chorus line of semiconductor companies into instant stardom," Intel soon set out to torpedo the 1982 AMD-Intel Technology Exchange Agreement (the "Agreement") by which each would serve as a second source for products developed by the other.  For example, Intel was required by the Agreement to send AMD timely updates of its second generation 80286 chip.  Instead, in a "deliberate" effort "to shackle AMD's progress," Intel sent AMD information "deliberately incomplete, deliberately indecipherable and deliberately unusable by AMD engineers," according to the arbitrator.  The conduct was, in the arbitrator's words, "inexcusable and unworthy."  Moreover, this conduct was not isolated. Intel elsewhere tried to "sabotage" AMD products, engaged in "corporate extortion" and demonstrated a near-malevolent determination "to use all of its economic force and power on a smaller competitor to have its way."

25.     In 1984, in another underhanded effort to stifle AMD's business, Intel decided that notwithstanding the Agreement, Intel would become the sole source for the promising 80386 chip.  To fully realize its objective, Intel engaged in a scheme to mislead AMD and the public into erroneously believing that AMD would be a second source for this chip product, thereby keeping AMD in the Intel "competitive camp" for years.

26.     This strategy served a broader purpose than simply preventing AMD from competing with Intel.  Customers' perception that AMD would continue to serve as Intel's authorized second source was essential to Intel's aim of entrenching the x86 family of microprocessors as the industry standard — just as it had been essential to IBM's original introduction of the PC.  Intel was well aware that if computer manufacturers knew Intel intended to sole source its 32-bit product, they would be motivated to select alternative products produced by companies offering second sources.  Intel could not preserve the appearance that AMD would second source the 386 if it terminated the contract or otherwise disclosed its actual intent.  Thus, Intel

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

PKNS\381148.1

1   stalled negotiations over product exchanges, while at the same time allowing AMD to

2   believe that it could ultimately obtain the 386. This injured competition by deterring

3   and impeding serious competitive challenges to Intel and directly injured AMD by

4   depriving it of the revenues and profits it would have earned from such a challenge.

5        27.    Intel implemented this secret plan for the purpose of acquiring and

6   maintaining an illegal monopoly in the x 86 lines of microprocessors, which it did by at

7   least 1987. As was its plan, Intel's conduct drained AMD's resources, delayed AMD's

8   ability to reverse-engineer or otherwise develop and manufacture competitive

9   products, and deterred AMD from pursuing relationships with other firms. In so doing,

10  Intel wrongfully secured the benefit of AMD's marketing skills and talent in support of

11  the x 86 lines of microprocessors and related peripherals and secured the benefit of

12  substantial competitively sensitive AMD information regarding its product

13  development plans. When AMD petitioned to compel arbitration in 1987 for Intel's

14  beach and bad faith, the arbitrator took notice of Intel's anticompetitive design: "In

15  fact, it is no fantasy that Intel wanted to blunt AMD's effectiveness in the

16  microprocessor marketplace, to effectively remove AMD as at competitor."

17       28.    In 1992, after five years of litigation, the arbitrator awarded AMD more

18  than $10 million in damages, prejudgment interest, and a permanent, nonexclusive

19  and royalty-free license to any Intel intellectual property embodied in AMD's own 386

20  microprocessor, including the x86 instruction set. Confirmation of the award was

21  upheld by the California Supreme Court two years later. In bringing the litigation to a

22  close, the arbitrator hoped that by his decision, "the competition sure to follow will be

23  beneficial to the parties through an expanded market with appropriate profit margins

24  and to the consumer worldwide through lower prices."

25  ***AMD Moves From Second Source To Innovator***

26       29.    Shortly after confirmation of the award, AMD settled its outstanding

27  disputes with Intel in a 1995 agreement which gave AMD a shared interest in the x86

28  instruction set, but required AMD to develop its own architecture to implement those

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

PKNS\381148.1

-10-

1   instructions. The settlement also had the unintended benefit of forcing AMD to

2   reinvent itself. Beginning in the late 1990s, AMD committed its resources to

3   innovation and differentiation. Going its own way proved beneficial: AMD's first x86

4   chip without Intel pin-compatibility, the Athlon microprocessor, delivered in 1999,

5   marked the first (but not last) time AMD was to leapfrog Intel technologically and beat

6   it to market with a new generation Windows microprocessor (and to break the I GHz

7   speed barrier in the process).

8       30.    Four years later, AMD introduced an extension of x86 architecture that

9   took Windows processors into the realm of 64-bit computing. Unlike Intel, which

10  invested billions in its Itanium microprocessor and a new, unique 64-bit proprietary

11  instruction set (which, because it was proprietary, would have been a game-ending

12  development for AMD had it become the industry standard), AMD undertook to

13  supplement the x86 instructions to accommodate 64-bit processing while allowing 32-

14  bit software to be run as well. AMD's efforts culminated in April 2003 when it brought

15  to market its Opteron microprocessor for servers (the workhorse computers used by

16  businesses to run corporate networks, e-commerce websites, and other high-end,

17  computationally-intense applications). Opteron was the industry's first x86 backward

18  compatible 64-bit chip. Six months later, AMD launched the Athlon64, a backward

19  compatible 64-bit microprocessor for desktops and mobile computers.

20      31.    The computing industry hailed AMD's introduction of 64-bit computing as

21  an engineering triumph. Said Infoworld its August 27, 2004 issue,

> You just gotta love a Cinderella story. . . . AMD's rapid rise
> from startup to $5 billion semiconductor powerhouse is, as
> Humphrey Bogart's English teacher once said, the stuff of
> which dreams are made. . . . In the process, AMD has
> become known as the company that kept Intel honest, the
> Linux of the semiconductor world. . . . After decades of
> aping Intel architectures, the AMD64 architecture, rooted in
> Opteron and Athlon 64 processors, has actually been
> imitated by Intel in the form of Nocona, Intel's 64-bit version
> of Xeon. In a stunning reversal of fortune, Intel was forced
> to build that chip because Opteron was invading a server
> market that the Intel titanium was supposed to dominate.

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

32.    In what represented a paradigm shift in the microprocessor world, Microsoft endorsed AMD's 64-bit instruction set and announced that Windows would support it. As noted by InfoWorld, Intel then copied AMD's technology for its own 64-bit offerings — an event that confirmed AMD's technological emergence.

33.    AMD has since extended its AMD64 technology to the balance of AMD's microprocessor line-up (which now includes AMD Athlon 64, AMD Athlon 64 FX, Mobile, AMD Athlon 64, AMD Sempron, and AMD Turion64 products). Owing also to AMD's innovations in dual-core processors and its introduction of an improved architecture that speeds up microprocessor communications with memory and input/output devices, AMD has advanced as a technological leader in the microprocessor industry. Its innovation has won for it over 70 technology leadership and industry awards and, in April 2005, the achievement of being named Processor Company of 2005" at, an Intel-sponsored industry awards show.

34.    Tellingly, however. AMD's market share has not kept pace with its technical leadership. Intel's misconduct is the reason. Intel has unlawfully maintained its monopoly and has systematically excluded AMD and other competitors from any meaningful opportunity to compete for market share by preventing the companies that buy chips and build computers from freely deploying processors sold by AMD and other competitors; by relegating AMD and other competitors to the low-end of the market; by preventing AMD and other competitors from achieving the minimum scale necessary to become a full-fledged, competitive alternative to Intel; and by erecting impediments to competitors' ability to increase productive capacity for the next generation of microprocessors.

35.    In addition to AMD, no other chip manufacturer has been able to successfully compete with Intel as a result of its anti-competitive acts as described herein.

/ / /

/ / /

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

## THE x86 PROCESSOR INDUSTRY

*Competitive Landscape*

36.    The x86 versions of Windows and Linux, the two operating systems that dominate the business and consumer computer worlds, have spawned a huge installed base of Windows- and Linux-compatible application programs that can only run on the x86 instruction set. This has given Intel effective ownership of personal computing. Although other microprocessors are offered for sale, the non-x86 microprocessors are not reasonably interchangeable with x86 microprocessors because none can run the x86 Windows or Linux operating systems or the application software written for them.

37.    The relevant product market is x86 Microprocessors, because a putative monopolist in this market would be able to raise the prices of x86 Microprocessors above a competitive level without losing so many customers to other microprocessors as to make this impractical. While existing end-users can theoretically shift to other operating-system platforms, high switching costs associated with replacing existing hardware and software make this impractical. Further, the number of new, first-time users who could choose a different operating-system platform is too small to prevent an x86 Microprocessor Chip monopolist from imposing a meaningful price increase for a non-transitory period of time. Computer manufacturers would also encounter high switching costs in moving from x86 Microprocessor Chips to other architectures and no major computer maker has ever done it. In short, demand is not cross-elastic between x86 Microprocessor Chips and other microprocessors at the competitive level.

38.    The relevant geographic market for x86 microprocessors is essentially worldwide. Intel and its competitors compete globally; PC platform architecture is the same from country to country; microprocessors can be, and frequently are, easily and inexpensively shipped around the world; and the potential for arbitrage prevents chipmakers from pricing processors differently in one country than another.

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

39.    Intel dominates the worldwide x86 Microprocessor Market. According to published reports, over the past several years, Intel has consistently achieved more than a 90% market share measured by revenue, while AMD's revenue share has remained at approximately 9%, with all other microprocessor manufacturers relegated to approximately 1%. Intel has captured at least 80% of x86 Microprocessor Chips sales in seven of the last eight years. Since 1999, AMD's worldwide volume share has hovered at 15%, only once penetrating the 20% level. The following chart illustrative:

### x86 Worldwide CPU Unit Market Share

|        | 1997  | 1998  | 1999  | 2000   | 2001  | 2002  | 2003  | 2004  |
|--------|-------|-------|-------|--------|-------|-------|-------|-------|
| Intel  | 85.0% | 80.3% | 82.2% | 82.2%  | 78.7% | 83.6% | 82.8% | 82.5% |
| AMD    | 7.3%  | 11.9% | 13.6% | 12.6.% | 20.2% | 14.9% | 15.5% | 15.8% |
| Others | 7.5%  | 7.9%  | 4.2%  | 1.1.%  | 1.1%  | 1.4%  | 1.7%` | 1.7%  |

40.    Intel's x86 family of microprocessors no longer faces any meaningful competition other than from AMD. National Semiconductor acquired Cyrix in 1997 but shuttered it less than two years later. At the beginning of this year only two other x86 chip makers remained - Via Technologies, Inc. and Transmeta Corporation – which together account for less than 2% of the market. Transmeta has since announced its intention to cease selling x86 microprocessors, and Via faces dim prospects of growing its market share to a sustainable level.

### Customers For x86 Microprocessors

41.    Intel is shielded from new competition by huge barriers to entry. A chip fabrication plant ("fab") capable of efficiently mass-producing x86 microprocessors carries a price tag of at least $2.5 to $3.0 billion. In addition, any new market entrant would need the financial wherewithal to underwrite billions more in research and development costs to design a competing x86 microprocessor and to overcome almost insurmountable IP and knowledge barriers.

/ / /

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

42.    Annual worldwide consumption of x86 Microprocessor Chips currently stands at just over 200 million units per year and is expected to grow by 50% over the remainder of the decade. Relatively few microprocessors are sold for server and workstation applications (6.75 million in 2004), but these command the highest prices. Most x86 Microprocessor Chips are used in desktop PCs and mobile PCs, with desktops currently outnumbering mobiles by a margin of three to one. Of the total worldwide production of computers powered by x86 Microprocessor Chips, 32% are sold to U.S. consumers: U.S. sales of AMD-powered computers account for 29% of AMD's production; California accounts for as much as 20-25% of end-users.

43.    The majority of x86 Microprocessor Chips are sold to a handful of large OEMs (original equipment manufacturers), highly visible companies recognized throughout the world as the leading computer makers. Regarded by the industry as "Tier One" OEMs over most product categories are: Hewlett-Packard ("HP"), which now also owns Compaq Computer; Dell, Inc.; IBM, which as of May 1, 2005, sold its PC (but not server) business to Lenovo; Gateway/eMachines; and Fujitsu/Fujitsu Siemens, the latter a Europe-based joint venture. Toshiba, Acer, NEC and Sony are also commonly viewed as Tier One OEMs in the notebook segment of the PC market. HP and Dell are the dominant players, collectively accounting for over 30% of worldwide desktop and mobile sales, and almost 60% of worldwide server sales. Both are U.S.-based companies, as are IBM and Gateway/eMachines; and all but Gateway have U.S. manufacturing operations (as does Sony, which operates a North American production facility in San Diego).

44.    Worldwide, the Tier One OEMs collectively account for almost 80% of servers and workstations (specialty high-powered desktops), more than 40% of worldwide desktop PCs, and over 80% of worldwide mobile PC's. According to industry publications, unit market share in 2004 among the Tier One OEMs was as follows:

/ / /

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

| CEM Market shares – 2004 | | | |
|---|---|---|---|
| Company | Server/WS | Desktop | Mobile |
| Hewlett-Packard | 29.86% | 13.69% | 16.23% |
| Dell | 28.34% | 16.18% | 17.27% |
| IBM/Lenovo | 14.46% | 3.69% | 9.20% |
| Fujitsu/Siemens | 3.70% | 2.83% | 6.88% |
| Acer | 0.81% | 1.85% | 8.53% |
| Toshiba | 0.31% | 0.05% | 12.73% |
| NEC | 2.06% | 2.02% | 4.50% |
| Sony | -- | 0.76% | 4.23% |
| Gateway/eMachines | 0.16% | 2.48% | 1.45% |
| Total | 79.70% | 43.55% | 81.02% |

45.    The balance of x86 production is sold to smaller system builders and to independent distributors. The latter, in turn, sell to smaller OEMs, regional computer assemblers, value-added resellers, and other, smaller distributors.

46.    OEMs have adopted a variety of business models, including direct sales to customers through web-based e-commerce, sales through company-employed sales staffs (who target IT professionals and Fortune 1000 companies) and sales through a network of independent distributors (who focus on smaller business customers). With the exception of Dell, which markets to consumers only directly (mostly over the Internet), most OEMs also sell their products through retail chains. Intel and its competitors compete not only to have OEMs incorporate their microprocessors into their retail platforms but also to convince retailers to allocate shelf-space so that the platforms containing their respective microprocessors can be purchased in the retailers' stores.

47.    Through its economic muscle and relentless marketing – principally its "Intel Inside" and "Centrino" programs, which financially reward OEMs for branding their PCs as Intel machines – Intel has transformed the OEM world. While once

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

1  innovative companies themselves, the OEMs have largely become undifferentiated

2  distributors of the Intel platform, offering "Intel Inside" and "Centrino" computers

3  largely indistinguishable from those of their rivals. As their products have become

4  commoditized, the Tier One OEMs operate on small or negative margins and the

5  overwhelming portion of PC profit flows to Intel.

6      48.    This profit drain has left OEMs and others in the distribution chain in a

7  quarter-to-quarter struggle to eke out even a modest return on their assets, thereby

8  making them continually susceptible to Intel's economic coercion, which is described

9  below.

10                        **INTEL'S UNLAWFUL PRACTICES**

11      49.    Intel has maintained its x86 microprocessor monopoly by deploying a

12  host of financial and other exclusionary business strategies that in effect limit its

13  customers' ability or incentive to deal with Intel's competitors. Although differing from

14  customer to customer and segment to segment, the Intel arsenal includes direct

15  payments in return for exclusivity and near-exclusivity; discriminatory rebates,

16  discounts and subsidies conditioned on customer "loyalty" that have the practical and

17  intended effect of creating exclusive or near-exclusive dealing arrangements; threats

18  of economic retaliation against those who give, or even contemplate giving, too much

19  of their business to Intel's competitors; and misuse of industry standards-setting

20  processes so as to disadvantage competitors' products in the marketplace, thus

21  increasing costs to consumers of x86 Microprocessor Chips and products containing

22  such chips – including those purchased by Plaintiff and the other members of the

23  Class.

24      50.    Intel's has targeted both U.S. and offshore customers at all levels to

25  prevent competitors from building market share anywhere, with the goal of stifling

26  competitors and keeping Intel's customers dependent on Intel for very substantial

27  amounts of product. In this way, OEMs remain vulnerable to continual threats of lintel

28  retaliation, competitors remain capacity-constrained, the OEMs remain Intel-

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

-17-

1  dependent, and Intel thereby perpetuates its economic hold over them, allowing it to

2  continue to demand that customers curtail their dealings with competitors.  The cycle

3  repeats itself:  by unlawfully exploiting its existing market share, Intel impedes the

4  growth of competitors, thereby laying a foundation for the next round of foreclosing

5  actions with the effect that competitors' ability to benefit from their current

6  technological advances is curtailed to the harm of consumers – including Plaintiff and

7  the other members of the Class.

8          **1)**     **Practices Directed At OEMs**

9             **a.**    **Exclusive and Near-Exclusive Deals**

10      51.  **Dell.**  In its history, Dell has not purchased a single AMD x86

11  Microprocessor Chip despite acknowledging Intel's shortcomings and customers'

12  requests for AMD solutions, principally in the server sector.  As Dell's President and

13  CEO, Kevin Rollins, publicly stated in February 2005:

14            Whenever one of our partners slips on either the economics
or technology, that causes us great concern. . . . For a

15            while, Intel admittedly slipped technologically and AMD had
made a step forward.  We were seeing that in customer

16            response and requests.

17      52.  Nonetheless, Dell has been and remains Intel-exclusive.  According to

18  industry reports, Intel has secured Dell's exclusivity with outright payments and

19  favorable discriminatory pricing and service.  In discussions about buying from AMD,

20  Dell executives have conceded that they must financially account for Intel retribution

21  in negotiating pricing from AMD.

22      53.  **Sony.**  With the introduction of its Athlon microprocessor in 1999, AMD

23  began to make notable inroads into Intel's sales to major Japanese OEMs, which

24  export PCs internationally including into California and the U.S.  By the end of 2002,

25  AMD had achieved an overall market share of approximately 22% to the major

26  Japanese OEMs.  To reverse the erosion of its business, in 2003 Intel paid Sony

27  multi-million dollar sums, disguised as discounts and promotional support, in

28  exchange for absolute microprocessor exclusivity.  Sony abruptly cancelled an AMD

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

1   Mobile Athlon notebook model. Soon thereafter, it cancelled plans to release AMD
2   Athlon desktop and notebook computers. As a result, AMD's share of Sony's
3   business dropped from 23% in 2002 to 8% in 2003, and then to 0%, where it remains
4   today. In proceedings brought by the Japanese Fair Trade Commission ("JFTC"),
5   Intel has failed to contest the JFTC charges of misconduct with respect to Sony.

6       54.   **Toshiba.** Like Sony, Toshiba was once a significant AMD customer, but
7   also like Sony, Toshiba received a very substantial payment from Intel in 2001 not to
8   use AMD processors. Toshiba thereupon dropped AMD. Its executives agreed that
9   Intel's financial inducements amounted to "cocaine," but said they were hooked,
10  because reengaging AMD would jeopardize Intel market development funds
11  estimated to be worth $25-30 million per quarter to Toshiba. Toshiba made clear to
12  AMD that the tens of millions of dollars of additional marketing support was provided
13  on the explicit condition that Toshiba could not use AMD microprocessors. In
14  proceedings brought by the JFTC, Intel has accepted the JFTC charges of
15  misconduct with respect to Toshiba.

16      55.   **NEC.** AMD also enjoyed early success with NEC, capturing nearly 40%
17  of its microprocessor purchases for notebooks and desktops in the first quarter of
18  2002. In May 2002, however, Intel agreed to pay NEC more than three billion yen per
19  quarter in exchange for caps on NEC's purchases from AMD. The caps assured Intel
20  at least 90% of NEC's business in Japan, and they established an overall worldwide
21  quota on NEC's AMD dealings. The impact was immediate. While AMD had
22  maintained an 84% share of NEC's Japanese consumer desktop business in the third
23  quarter of 2002, after the payments, AMD's share quickly plummeted to virtually zero
24  in the first quarter of 2003. NEC has made clear to AMD that its Japanese share
25  must stay in the single digits pursuant to NEC's agreement with Intel. Worldwide,
26  AMD's share dipped from nearly 40% to around 15%, where it stands today. In
27  proceedings brought by the JFTC, Intel has accepted the JFTC charges of
28  misconduct with respect to NEC.

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

56. **Fujitsu.** In the summer of 2002, Fujitsu informed AMD that Intel had pressured Fujitsu to remove Fujitsu's AMD-powered desktop models from Fujitsu's website. Fujitsu complied by making any potential AMD buyer click past Intel products to get to the AMD offerings. Then, in early 2003, Intel moved to lock up an even greater share of Fujitsu's business. Intel offered an undisclosed package of financial incentives to Fujitsu in return for Fujitsu's agreement to restrict its dealings with AMD. Fujitsu's catalog currently limits AMD to a single notebook product. In proceedings brought by the JFTC, Iintel has accepted the JFTC charges of misconduct with respect to Fujitsu.

57. **Hitachi.** According to the JFTC, Intel has also purchased an exclusive-dealing arrangement with Hitachi, which had been a substantial AMD customer. The agreement caused AMD's Hitachi business to fall precipitously. For example, during the first part of 2002, AMD was shipping 50,000 Athlon microprocessors to Hitachi per quarter. But by the middle of the year, AMD sold no microprocessors to Hitachi at all. In proceedings brought by the JFTC, Intel has accepted the JFTC charges of misconduct with respect to Hitachi.

58. **Gateway/eMachines.** From 2001 to 2004, Gateway was exclusively Intel – which was not the case prior to that time. In 2001 former Gateway CEO, Ted Waitt, explained to an AMD executive that Intel offered him large monetary inducements not to deal with AMD – which he could not refuse: "I have to find a way back to profitability. If by dropping you, I become profitable, that is what I will do." Shortly thereafter, Gateway stopped purchasing from AMD and issued a press release announcing its Intel exclusivity. The announcement came within weeks of similar public announcements of Intel exclusivity by both IBM and Micron.

59. **Supermicro.** Intel's exclusive dealing also extends to small, specialty OEMs, of which Supermicro is a good example. Supermicro, the preeminent system assembler for servers and other high-end computers, historically has followed the Dell strategy of never buying from AMD. This arrangement foreclosed AMD from a large

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

1   part of the approximately one-fifth of the server sector not controlled by the Tier One

2   OEMs. Following two years of negotiation, Supermicro, in 2004, finally agreed to

3   begin developing an Opteron-powered server; however. Supermicro so feared

4   retaliation by Intel relating thereto that it secretly moved the AMD development to

5   quarters behind Supermicro's main manufacturing facility. Further, Supermicro

6   forbade AMD from publicizing the product or beginning any marketing prior to its

7   actual release. When, in April 2005, Supermicro finally broke away from years of Intel

8   exclusivity, it restricted distribution of its newly-released Opteron-powered product to

9   only sixty of its customers and promoted them with a glossy, upscale brochure devoid

10  of its name and labeled "secret and confidential."

11              **b.      Product-line, Channel, or Geographic Restrictions**

12      60.     Intel has also bought more limited exclusivity from OEMs in order to

13  exclude AMD from the most profitable lines or from channels of distribution best

14  tailored to take advantage of AMD's price/performance advantage over Intel.

15      61.     In exchange for discriminatory discounts, subsidies or payments, for

16  example, Intel has largely foreclosed AMD from the lucrative commercial desktop

17  sector. Intel has focused on the major OEMs because, when IT executives from

18  Fortune 1000 companies purchase desktop computers, they look for a strong brand

19  on the box – Dell, IBM or HP. Knowing this, Intel has relentlessly fought to block the

20  introduction of an AMD-powered commercial desktop by the major OEMs who have

21  not ceded total exclusivity to Intel. What follows, again, are only representative

22  examples of Intel misconduct.

23      62.     **HP.** In 2002, when AMD set out to earn a place in HP's commercial

24  desktop product roadmap, HP demanded a $25 million quarterly fund to compensate

25  it for Intel's expected retaliation. Eager to break into the commercial market, and to

26  earn a place in HP's successful "Evo" product line, AMD agreed instead to provide

27  HP with the first million microprocessors for free in an effort to overcome Intel's

28  financial hold over HP. On the eve of the launch, HP disclosed its plan to Intel, which

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

1  told HP it considered AMD's entry into HP's commercial line a "Richter 10" event. It

2  immediately pressured HP into: (a) withdrawing the AMD offering from its premier

3  "Evo" brand; and (b) withholding the AMD-powered computer from HP's network of

4  independent value-added resellers, HP's principal point of access to small business

5  users for whom the computer was designed in the first place. Intel went so far as to

6  pressure HP's senior management to consider firing the HP executive who

7  spearheaded the AMD commercial desktop proposal. As a result of Intel's coercion,

8  the HP-AMD desktop offering was dead on arrival. HP ended up taking only 160,000

9  of the million microprocessors AMD offered for free. As of today, HP's AMD-equipped

10 commercial desktops remain channel-restricted, and AMD's share of this business

11 remains insignificant.

12      63.    Intel also purchased HP's exclusivity for its most popular notebook line.

13 HP captured 15% of the U.S. retail market last Christmas with an Intel-powered 14.1"

14 display notebook (the "DV 1000") with a popular power-saving feature called Quick

15 Play. When AMD sought to convince HP to carry a similar AMD-powered notebook,

16 HP declined. It explained that Intel had paid between $3 and $4 million to lock up this

17 product line for at least one year.

18      64.    **Gateway.** After Gateway's 2004 merger with eMachines, AMD

19 attempted to revive the relationship it had enjoyed with Gateway until 2001, but

20 experienced extremely limited success. While Gateway built one AMD-powered

21 desktop model at the request of Circuit City, AMD remains locked out entirely of

22 Gateway's direct internet sales, its commercial offerings and its server line.

23 According to Gateway executives, their Company has paid a high price for even its

24 limited AMD dealings. They claim that Intel has beaten them into "guacamole" in

25 retaliation for those limited dealings.

26      65.    **IBM.** AMD and IBM began negotiations in August 2000 over a proposed

27 commercial PC business partnership. After seven months and with a deal nearing

28 completion, Intel approached IBM with an incentive-based program under which Intel

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

1 would become IBM's "preferred supplier" for processors in commercial products.

2 "Preferred" meant exclusive. IBM accepted Intel's proposal and terminated

3 discussions with AMD. In return for that exclusivity, according to IBM executive Ed

4 Thum, Intel paid IBM "millions of dollars in market development funds."

5      66. Intel also acted to thwart AMD efforts to partner with IBM on servers.

6 Although IBM joined AMD as a launch partner when it introduced its Opteron 64-bit

7 server chip in April 2003 – signaling to the industry and IT professionals its

8 confidence in the product — Intel soon dissuaded IBM from aggressively marketing

9 Opteron servers. After investing heavily in its design, IBM consigned its one Opteron

10 computer model to a single target market segment (High Performance and Technical

11 Computing). This was done, according to an industry report (confirmed by an IBM

12 executive), because Intel paid IBM to shelve any further Opteron development. IBM

13 also took Intel money in 2004 to scrap plans for a multiple-microprocessor Opteron

14 server it had already designed and previewed with customers.

15      67. Intel has also purchased IBM exclusivity in its "ThinkCentre" line of

16 commercial desktops. When AMD pressed IBM to add an Athlon 64 model to its

17 "ThinkCentre" roadmap, IBM executives explained that the move would cost them

18 important Intel subsidies, and they thus declined to do so.

19      68. **Fujitsu.** In 2002, Fujitsu and AMD formed an alliance to develop a low-

20 power commercial notebook (FMV Lifebook MG Series) scheduled to go to market in

21 the first quarter of 2001 which AMD spent over 20 million yen designing. Shortly

22 before the launch. Fujitsu told AMD that Intel would not allow it to launch an AMD-

23 powered commercial notebook, and the project died. To this day. AMD remains

24 locked out of Fujitsu's commercial notebook lines. Intel's exclusionary conduct with

25 Fujitsu extends beyond commercial notebooks. In the consumer space, for example,

26 Intel purchased total exclusivity for Fujitsu's FM-Biblo NB consumer notebook line.

27 When AMD tried to break Intel's lock on Fujitsu notebooks by offering to match any

28 Intel discount, Fujitsu made clear that there was no price AMD could pay because

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

1   Intel simply would not allow it. To this day, AMD remains locked out of Fujitsu's Biblo
2   line.

3       69.    **Fujitsu-Siemens.** Fujitsu-Siemens, a European joint-venture, was once
4   a mainstay for AMD's desktop business, with AMD chips powering over 30% of
5   Fujitsu-Siemens' offerings in the consumer sector. In early 2003, Intel offered Fujitsu-
6   Siemens a "special discount" on Celeron processors which Fujitsu-Siemens accepted
7   in exchange for hiding its AMD computers on its website and removing all references
8   to commercial AMD-powered products in the company's retail catalog.

9       70.    Intel has also succeeded in convincing Fujitsu-Siemens to impose
10  market restrictions on its AMD-powered PCs. Its parent, Fujitsu, currently sells an
11  AMD-equipped Lifebook S2010, a commercial notebook, but only in the U.S. and
12  Japan. Fujitsu-Siemens has declined AMD's plea to offer the machine in the
13  European market as well. Similarly, Fujitsu-Siemens designed for the European
14  market the FMC Lifebook MG Series notebook. Fujitsu-Siemens, however, refused to
15  offer that computer in Asia or North America. Finally, although Fujitsu-Siemens
16  produces an AMD commercial desktop – the Scenico – it refuses to advertise it on its
17  website, offering it instead only as a build-to-order product. Having invested
18  significantly to bring these computers to market, Fujitsu-Siemens has been able to
19  offer no explanation for its refusal to exploit them worldwide. AMD's unit share of
20  Fujitsu-Siemens' business recently fell below 30% for the first time in four years.

21      71.    **NEC.** Intel was forced to relax its hold on NEC's business when long-
22  time NEC customer, Honda Motor Company, demanded that NEC supply it with
23  servers powered by AMD's Opteron microprocessors. After underwriting the
24  considerable expenses of designing and manufacturing an Opteron server for Honda,
25  NEC then inexplicably refused to market the product to any of is other customers.

26      72.    There is no reason, other than Intel's chokehold on the OEMs, for AMD's
27  inability to exploit its products in important sectors, particularly commercial desktops.
28  These computers, which large corporate customers buy in the tens of thousands at a

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

1  time, represent a lucrative opportunity for the supplier.  Yet, the microprocessors that

2  power them are identical to microprocessors in consumer computers, a sector in

3  which AMD has won both praise and market share.  The only material difference

4  between the consumer and commercial segments is that many more system builders

5  supply desktops to consumers, making it more difficult for Intel to control their

6  microprocessor choice.

7                    c.    Exclusionary Rebates

8          73.    Intel has also imposed on OEMs a system of "first dollar" rebates that

9  have the practical and intended effect of creating exclusive or near-exclusive dealing

10  arrangements and artificially foreclosing AMD from competing for a meaningful share

11  of the market.

12          74.    In general, the rebate schemes operate as follows:  quarterly, Intel

13  unilaterally establishes for each of its customers a target level of purchases of Intel

14  microprocessors.  If the customer achieves the target, it is entitled to a rebate on all of

15  the quarter's purchases of microprocessors -- back to the very first one -- generally in

16  the neighborhood of 8-10% of the price paid.  Intel provides the rebate in cash at the

17  quarter's close.  OEMs operate on razor-thin margins, so qualifying for an Intel rebate

18  frequently means the difference between reporting a profit or a loss in the coming --

19  and closely watched -- quarterly earnings.

20          75.    In contrast to "volume discounts" that sellers offer on a graduated and

21  non-discriminatory basis to reflect cost efficiencies that accrue when dealing in larger

22  quantities, Intel's is a system of "penetration" or "loyalty" rebates designed to exclude

23  AMD from a substantial portion of the market.  Intel intentionally sets a rebate trigger

24  at a level of purchases it knows to constitute a dominant percentage of a customer's

25  needs.  Intel is able to develop discriminatory, customer-by-customer unit or dollar

26  targets that lock that percentage (without ever referencing it) because industry

27  publications accurately forecast and track anticipated sales and because OEM market

28  ///

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

1 shares -- which industry publications also report weekly, monthly and quarterly -- do
2 not change significantly quarter to quarter.

3      76.   Intel's retroactive discounts can operate to price microprocessors in such
4 a manner so that its competitors suffer a competitive disadvantage they cannot
5 overcome.

6      77.   At least in the short run, most if not all of the major OEMs must engage
7 significantly with Intel: (a) because AMD is too small to service all their needs while
8 continuing to satisfy other customer demand; (b) because to meet customer
9 expectations, OEMs must assure commercial computer buyers that specifications,
10 including the microprocessor, will remain unchanged during the product's lifecycle;
11 and (c) because Intel has encouraged end-users to specify that processors be of the
12 same family among similar computers in one installation, as this is perceived to
13 increase reliability (although technically this is not the case).

14      78.   Intel uses its retroactive discounts to make its large, captive market
15 share self-perpetuating. In any one quarter, Intel's competitors cannot economically
16 match Intel's retroactive rebate because they compete for too small a share of the
17 customer's volume over which to spread the dollars necessary to equal the
18 customer's total Intel cost savings. As a result, they lose the business and thus go
19 into the next selling cycle with Intel imbedded in additional customer product over
20 which Intel can spread its rebates. This serves again to artificially constrain
21 competitors' opportunity to match Intel's ensuing round of retroactive discounts.
22 Intel's inter-temporal leveraging of its market share effectively forecloses competitors
23 from ever having a fair opportunity to compete.

24      79.   Intel exacts a severe penalty from OEMs who fail to meet their targets.
25 For example, during the fourth quarter of 2004, AMD succeeded in getting on the HP
26 retail roadmap for mobile computers, and its products sold very well, helping AMD
27 capture nearly 60% of HP's U.S. retail sales for the quarter. Intel responded by
28 withholding HP's fourth quarter rebate cheek and refusing to waive HP's failure to

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

1  achieve its targeted rebate goal. Instead, Intel "allowed" HP to make up the shortfall

2  in succeeding quarters when HP promised Intel at least 90% of HP's mainstream

3  retail business.

4       80.   Intel has deployed a variety of variants of this basic rebate scheme. In

5  the case of one European OEM, for example, Intel imposes the additional condition

6  that the customer purchase target volumes of specific processors, generally

7  microprocessors against which AMD's products compete particularly well. In the case

8  of another, Intel offers as an inducement discounted microprocessors rather than

9  rebates. In the case of the European division of one U.S. OEM, Intel has imposed a

10  target of between 70-90% of the customer's requirements. Rather than qualifying the

11  customer for a cash rebate, however, meeting the target entitles the OEM to

12  purchase designated processors at up to 20% below "normal" cost, thereby enabling

13  the customer to obtain favorable pricing on bundled products (e.g., a Centrino-series

14  processor and chipset) and/or to receive product offerings not available to

15  competitors.

16       81.   Intel makes similar offers to smaller OEMs but they are generally

17  unwritten, and Intel leaves undefined the consequences of failing to meet a target.

18  Thus, a customer falls short at its peril, knowing only that it may lose its account with

19  Intel and have to source future products from Intel distributors, which is both more

20  expensive and provides less security of supply than direct purchase.

21       82.   The salient features of all of Intel's rebate schemes are that they are

22  discriminatory and market-foreclosing. If the customer chooses to purchase any

23  significant quantity of microprocessors from one of Intel's competitors, it will not

24  qualify for its rebate, and its price will be higher on all the Intel processors it buys

25  across the board. By tailoring targets to each customer's size and anticipated

26  volume, Intel locks up significant percentages of the market much more effectively

27  and at a lesser cost to itself -- but to a greater harm to Intel's competitors and

28  / / /

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

1 ultimately consumers -- as compared to offering such rebates for comparable

2 purchase levels to all customers an a nondiscriminatory basis.

3        83.    Intel's use of retroactive rebates leads, in some cases, to below-cost

4 pricing on incremental sales. The following example shows why a customer's

5 incremental cost of purchasing from Intel those units that both Intel and a competitor

6 could supply (the "contested sales") can be zero or even negative -- a price the

7 competitor cannot match. Consider an OEM which has purchased 90 units of

8 Microprocessor A at $100 per unit under an Intel rebate scheme that entitles it to a

9 10% first-dollar discount but only after it purchases more than 90 units. Its cost for

10 the 90 processors is $9,000. The OEM is now considering an additional purchase of

11 a further 10 units. If it makes the additional purchase from Intel, the OEM will meet

12 the expenditure condition and will qualify for the 10% per unit discount on all units.

13 Accordingly, the total spent will remain $9,000. The incremental cost of the 10

14 additional microprocessors — as well as Intel's incremental revenue will be zero (the

15 $1,001 additionally spent, less the $1,000 thereby saved). In other words, this

16 scheme leads to incremental units being offered to the OEMs for nothing, leaving the

17 competitor hopelessly boxed out.

18        84.    Importantly, even if Intel were to earn some incremental revenue on

19 these marginal units, these additional revenues could be below the incremental cost

20 of their production. As a result, Intel's additional profit on the sale would be negative,

21 but far the fact that it had a long-run exclusionary effect on competitors. (Obviously, if

22 Intel earns no revenues on its additional sales, it has to be foregoing profits.) As this

23 analysis shows, some of Intel's discriminatory, retroactive rebates amount to unlawful,

24 predatory below-cost pricing.

25        85.    Even where Intel's prices are above cost on the incremental volumes

26 and overall despite its retroactive rebate schemes, these rebates enable Intel to lower

27 prices selectively in the contested market segment while maintaining higher prices in

28 its captive market.

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387

86.   For example, Intel can offer rebates which are granted across the entire volume of sales but which are triggered only if the OEM increases its purchases beyond the portion of its requirements which is captive to Intel. Indeed, Intel can even price above the "monopoly" level for the volumes below the benchmark and offer huge discounts for additional purchases knowing full well that the OEM will not buy less than the benchmark and, instead, source the overwhelming share of its purchases from Intel thereby "qualifying" for the putative rebate while at the same time denying AMD any reasonable volume opportunity.

87.   The use of retroactive rebates to limit competitors to a small share of an OEM's business heightens the obstacles to inducing the OEM to launch platforms powered by microprocessors sold by Intel's competitors. OEMs incur substantial expense in designing and engineering a new computer, and make the investment only if they foresee a substantial chance of selling a sufficient volume to recoup it. Intel's rebate and other business strategies effectively cap the volumes of non-Intel processor-powered products that an OEM can sell. Hence, Intel's practices exacerbate normal impediments to entry and expansion.

### d.   Threats of Retaliation

88.   Beyond exclusive dealing, product and channel restrictions and exclusionary rebates, Intel has resorted to old-fashioned threats, intimidation and "knee-capping" to deter OEMs from dealing with Intel's competitors. Intel has a variety of pressure points at its disposal: It can unilaterally reduce or withdraw a discount, rebate or subsidy; it can impose a discriminatory price increase on a disfavored customer, extend a price cut to that customer's competitor, or force retailers into dropping the customer's computers and buying from its competitor instead; or it can delay or dispute an allowance or rebate -- all of which can turn a profitable quarter for an OEM into an unprofitable one. Other pressure points on accounts it deems disloyal include threatening to delay or curtail supplies of scarce processors or essential technical information. Examples abound.

POST KIRBY NOONAN & SWEAT LLP
ONE AMERICA PLAZA
600 WEST BROADWAY, SUITE 1100
SAN DIEGO, CALIFORNIA 92101-3387