89. As Gateway executives have recounted, Intel's threats beat them into "guacamole." But Gateway is not alone. Prior to its merger with HP, Compaq Computer received Intel threats every time it engaged with AMD. In late 2000, for example, Compaq's CEO, Michael Capellas, disclosed that because of the volume of business he had given to AMD, Intel withheld delivery of server chips that Compaq desperately needed. Reporting that "he had a gun to his head," Capellas informed an AMD executive that he had to stop buying AMD processors.

90. In 2002, Intel targeted NEC. Intel threatened to discontinue providing NEC with the technological roadmap of future Intel products if NEC did not convert its entire line of Value Star L computers to Intel microprocessors. Without that roadmap, NEC would be at a distinct competitive disadvantage. Predictably, NEC succumbed and eliminated AMD from the Value Star L series in 2002 and 2003.

91. AMD had been engaged in discussions with IBM about introducing an Opteron "blade" server, when IBM suddenly announced that any such product it distributed could not bear an IBM logo. When pressed for an explanation, IBM reported that it could not appear overly supportive of AMD server products because it feared retaliation from Intel.

e. **Interference with AMD Product Launches**

92. Key to gaining quick market acceptance of a new microprocessor is a chipmaker's ability to develop a lineup of reputable launch partners, consisting of OEMs prepared to roll out products featuring the chip, major customers who are willing to buy and embrace it, and other industry allies, such as major software vendors and infrastructure partners who can attest to its quality and reliability. Particularly for commercial and enterprise (i.e., server-work station) purchasers, a successful and impressive "launch" is essential to generating confidence among the computer professionals who will be the potential audience for the new microprocessor.

///

93. Aware of the importance of product launches, Intel has done its utmost to undermine AMD. Set forth below are several examples.

94. AMD's September 23, 2003, launch of Athlon64 was a watershed event for the Company. Upon learning the launch schedule, Intel did its best to disrupt it. For example, Acer committed to support the AMD rollout by making a senior executive available for a videotaped endorsement and by timing the introduction of two computers, a desktop and a notebook, to coincide with AMD events planned for Cannes, San Francisco and Taiwan. Days before the event, Intel CEO, Craig Barrett, visited Acer's Chairman, CEO and President in Taiwan, expressed to them Intel's "concern" and said Acer would suffer "severe consequences" if it publicly supported AMD's launch. The Barrett visit coincided with an unexplained delay by Intel providing $15-20 million in market development funds owed to Acer. As a result, Acer withdrew from the launch in the U.S. and Taiwan, pulled promotional materials, banned AMD's use of the video, and delayed the announcement of its Athlon64-powered computers. Acer's President subsequently reported that the only thing different about Intel's threats was the messenger -- they were "usually done by lower ranking managers," not Intel's CEO.

95. HP also withdrew precipitously from the Athlon64 launch after committing to participate. HP had agreed to support the launch by producing a promotional video and by sending senior executives to all three launch sites. Just before launch, however, HP manager, John Romano, pulled the video and announced that HP would only be sending a junior manager, and then only to Europe.

96. Other AMD customers and channel partners reporting Intel coercion to withdraw from the Athlon64 launch were Lenovo, NEC-CI, and Best Buy.

97. Intel also disrupted AMD's launch of its Opteron server chip, which was rolled out on April 22, 2003, with few in attendance and little industry support. A computer industry journal reported Intel's fingerprints: "They all (vendors) told me that prior to the launch, they received a phone call from Intel. Intel asked if they were

1 going to the launch. If they replied yes, the Intel rep asked them if it was 'important to
2 them to go', or 'if they really wanted to go.' Pressing the vendors, I got the same
3 response, 'Intel is too smart to threaten us directly, but it was quite clear from that
4 phone call that we would be risking our various kickback money if we went'."

5       98.    Other companies that reported being intimidated from participating in the
6 Opteron launch were MSI, Atipa, Solectron and Fujitsu-Siemens. Indeed, Intel
7 representatives told Fujitsu-Siemens' executives in the weeks preceding the Opteron
8 launch that if they attended, they would be the only Tier One OEM showing its
9 support as all of the others would back out. With the exception of IBM, Intel was right.

10       99.    These are not isolated examples, but rather illustrations of Intel's
11 relentless campaign to undermine marketing efforts by its one remaining competitor.
12 For example, IBM pulled its AMD-powered computers from the 2004 Palisades
13 eServer and PC Show, citing a contractual agreement with Intel said to prohibit it from
14 endorsing those competitive products. And at the 2004 Super Computing Show, an
15 annual conference devoted to high performance computing, Intel offered two other
16 AMD customers money to remove AMD systems from their booths. At CeBit, Intel
17 threatened to pull a half million dollars of support from Fujitsu-Siemens for displaying
18 AMD products (which were removed).

19       **f.**    **Product Bundling**

20       100.    Intel also uses product bundling as an exclusionary weapon in a variety
21 of ways. Intel's most common deployment is in bidding for a new OEM platform; it
22 bundles microprocessors with free (or heavily discounted) chipsets or motherboards,
23 often offered in amounts exceeding the OEM's requirements for the new platform.
24 (The excess, of course, is only compatible with Intel processors, thereby providing the
25 OEM a strong inducement to go with Intel rather than AMD on uncommitted models.).
26 AMD does not sell chipsets or motherboards; they are provided by independent
27 suppliers such as ATI, nVidia and Via which incur their own costs and control their
28 own pricing. Hence, to match Intel's bundled microprocessor-chipsets-motherboards

offer, AMD must extend a discount on its microprocessors that will not only match any Intel discount on the microprocessors themselves but also will compensate the OEM for the savings it will lose on independent Intel chipset and motherboard purchases. The additional compensation AMD is forced to provide through a discount on the sale of microprocessors alone makes AMD's sale of microprocessors potentially unremunerative, and it also enables Intel to avoid competing with AMD directly on microprocessor price and quality by imposing disproportionate burdens on AMD that are wholly unrelated to AMD's product quality which, as has been demonstrated, is frequently superior to that of Intel's.

101. As retaliation for dealing with AMD, Intel has also used chipset pricing as a bludgeon. For example, in 2003, Acer had committed to launch the AMD Athlon XP. Acer executives worldwide had been working with AMD to bring the product to market post-launch. But, on the eve of the launch the Acer management in Taiwan pulled the plug. AMD learned from Acer executives that Intel had threatened to raise chipset prices by $10 on all Intel-based Acer systems if any processor business was awarded to AMD outside of Europe.

102. Intel's dealings with OEMs are unlawfully exclusionary, have no pro-competitive justification, and are intended to maintain its monopoly.

### 2) Practices Directed At Distributors

103. Intel uses many of the same tactics it practices on OEMs to restrict distributors from carrying AMD processors or selling AMD products into markets it deems strategic. For example. it entered into an exclusive deal with Synnex, which is one of the largest U.S. distributors. Given Intel's 80% plus market share, there is no pro-competitive justification for this arrangement.

104. As with OEMs, Intel offers discounts and rebates to distributors on the condition that they not do business with AMD.

105. Intel also offers a panoply of special programs for distributors who carry Intel microprocessors exclusively: marketing bonuses, increased rebates, credit

programs for new customers (credits that can be used for all products from Intel and any other suppliers), payment for normal freight charges, and special inventory assistance such as credits to offset inventory costs. When such nuanced means of achieving exclusivity fail, Intel has simply bribed distributors not to do business with AMD. For example, a high-ranking Tech Data executive turned down $1 million to stop doing business with AMD, causing the Intel representatives to ask, "How much would it take?"

106.  Intel also offers retroactive rebates triggered when a distributor reaches a prescribed buying quota. Like the rebates offered to OEMs, the intent is to inflict economic punishment on those who do too much business with AMD. Unlike OEM's however, distributors remain ignorant of the goals Intel has set for them or the precise consequences of failing to meet them. Intel does not share this information with them; they simply receive a check at the end of a quarter. As a result, every AMD chip they purchase, they buy at their peril.

107.  Finally, those distributors who choose to do business with AMD have been conditioned to expect Intel retaliation. For example, when ASI, one of the largest computer hardware and software distributors, began distributing AMD processors, Intel demanded that it exclude AMD personnel from its ASI Technology Shows and its General Managers' meetings. Until recently, ASI refused master distributor status from AMD, despite the financial benefits attached, because it feared that such a public alignment with AMD would trigger Intel retaliation. When, in January 2005, it finally accepted Master Distributor status, Intel began reducing the level of market development funds ASI received.

108.  Avnet Inc., one of the world's largest computer equipment distributors, has also received its share of Intel intimidation. Thus, Avnet cited Intel as the reason it could not distribute AMD parts to the industrial sector. And when AMD launched its Opteron server chip, Intel made clear it would make it "painful" for Avnet were it to begin distributing that chip. When Avnet did so anyway, Intel threatened to cut if off.

109. Intel's dealings with distributors are unlawfully exclusionary, have no pro-competitive justification, and are intended to maintain its monopoly.

### 3) Practices Directed At Retailers

110. In both the U.S. and internationally, approximately one fifth of desktop and notebook computers are purchased at retail stores. A handful of retailers dominate the U.S. PC market: Best Buy and Circuit City are the largest. Other significant but smaller retailers are WalMart/Sam's Club, Staples, Office Depot, and Office Max.

111. Most of the PCs sold at retail are sold during four or five "buying seasons" that correspond to events on the calendar ("Dads and Grads," "Back to School," "Holiday," and the like), and retailers refresh their inventory for each of those events. A chipmaker faces a two-step process to get its platform on retail shelves: first, it must convince one or more OEMs to build machines using its microprocessor at a suggested price point (called "getting on the roadmap"); and second, it must convince the retailer to stock and devote shelf space to these machines. Shelf space does not come for free.

112. The major retailers demand market development funds ("MDF") in exchange. MDF can consist of cooperative advertising support, but more frequently it comprises a marketing-related opportunity that a chipmaker must buy for tens of thousands of dollars, for example, space in a Sunday circular, an in-store display or an Internet training opportunity with the chain's sales staff. The MLF required to secure shelf space can run as high as $25 per box depending on the computer price point and how urgently the competing chipmakers want the shelf space.

113. Intel has historically enjoyed an advantage over AMD at retail because, using many of the strategies described above, it has had greater access to the OEMs' roadmaps and the ability to exert pressure to keep AMD out of their product plans. Also, it has significantly greater financial resources with which to buy retail shelf space.

114. But to leverage those advantages, Intel has also made exclusive deals with many key retailers around the world. For example, until recently Office Depot declined to stock AMD powered notebooks regardless of the amount of MDF AMD offered, contending that to do so would put its "premier" status with Intel at risk. Fry's is Fujitsu's only retailer in the United States. When Intel learned that Fry's was very successfully marketing a Fujitsu's Athlon™ XP-based notebook, it offered Fry's a large payment to remove it from its shelves.

115. AMD has nonetheless made some progress in gaining retail market share. Because of price/performance advantages, which are key in retail, OEMs build approximately 15% of their U.S. domestic market desktops with AMD processors; within notebook roadmaps, AMD represents approximately 10%. On a shelf space to sales basis, AMD has generally outperformed Intel. For instance, in the desktop segment during the fourth quarter of 2004, AMD-equipped computers captured between a 33%-38% share of Circuit City's sales, despite being limited to five of the 25 models (20%) on the Circuit City shelves. And with approximately 15% of the shelf space allotted to its products at Best Buy and CompUSA, AMD computers accounted for roughly 30% and 22% of their sales, respectively. These numbers confirm that AMD's products perform well at retail, provided that space is available.

116. In fact, Intel's sales staff was instructed "not to let this happen again." As a result, Intel instituted a rebate program similar to what it foisted on OEMs, with similar exclusionary effect. Under this program, Intel provides full MDF payments to retailers, such as Best Buy and Circuit City, only if they agree to limit to 20% not just the shelf space devoted to AMD-based products, but also the share of revenues they generate from selling AMD platforms. If AMD's share exceeds 20%, the offending retailer's marketing support from Intel is cut by 33% across all products.

117. This is how the program works at Circuit City. If less than 20% of Circuit City's notebook revenue derives from AMD-based computers (30% for desktops), Intel has agreed to pay Circuit City $15 in MDF per Intel-powered machine; but if the

1  AMD percentage reaches or exceeds 20%, Circuit City's MDF subsidy is cut to $10.
2  This creates a $5 per box "tax" on the retailer for doing 20% or more of its dollar
3  volume with AMD-powered machines; and this "tax" is applicable to all of the Intel-
4  powered machines that the retailer buys, back to the very first machine.

5     118.  The following illustrates the competitive disadvantage this creates for
6  AMD: If Circuit City were to purchase only Intel-powered notebooks for its 200,000-
7  unit inventory in a quarter, Intel would pay it $15 of MDF per computer, or a total of $3
8  million. If Circuit City, however, were to reduce its purchase of Intel-based notebooks
9  to 80% (160,000 units) so that it could stock a modest number of AMD-powered
10 computers, Intel MDF would fall to $1.6 million ($10/MDF/unit times 160,000 units).
11 Were AMD to match Intel's $10 per unit MDF on the 40,000 units it supplied, Circuit
12 City would receive an additional $400,000, bringing its total MDF to $2 million, leaving
13 it $1 million worse off or doing business with AMD. For AMD to make Circuit City
14 "whole," it would have to vastly increase its MDF on its 20% share to $35 MDF per
15 unit (40,000 x $35 = $1.4M), which together with Intel's $1.6 million would bring the
16 total MDF back to $3 million. In other words, to just capture a 20% share, AMD must
17 offer two or three times as much MDF as Intel – because it has far fewer units over
18 which to spread the difference. Given those perverse economies, Circuit City is not
19 likely to allocate less than 80% of its notebook sales to Intel, even if it means taking
20 AMD stock off the shelves at the end of a quarter. (Indeed, to avoid inadvertently
21 running afoul of the limitation, a prudent distributor would keep AMD's share well
22 short of 20%.)

23     119.  Intel's dealings with retailers are unlawfully exclusionary, have no pro-
24 competitive justification, and are intended to maintain its monopoly at the expense of,
25 *inter alia*, Plaintiff and the members of the Class.

26 ///
27 ///
28 ///

### 4) Intel's Standard Setting and Other Technical Abuses

#### a. Intel's Exclusion of AMD from Industry Standards

120. Companies within the computer industry often agree to design certain aspects of their products in accordance with industry standards to ensure broad compatibility. Indeed, standards are not only ubiquitous in the computer industry, they are essential. When a company is unfairly excluded from the standards-setting process or is denied timely access to the standard, however, competition can be restrained in a way that reverberates throughout the entire market. Intel has employed, and continues to employ, a variety of tactics that have the purpose and effect of excluding and/or hampering AMD's full and active participation in the development of important industry standards. Intel has also worked to deny AMD timely access to such standards. Its efforts have hampered AMD's ability to vigorously compete in the market.

121. By way of example, Intel and AMD each develop and manufacture memory controller technologies that allow their processors and related components to communicate with memory. Intel designs and manufactures an entirely separate chip for this purpose, known as the Graphics and Memory Controller Hub, but AMD embeds its memory controllers directly into its processors, thus dispensing with the need for an extra chip and speeding up communication. Both companies need to know and have access to memory standards well in advance of producing their processors and/or chipsets so that their memory controller designs will be compatible with the next generation of memory devices.

122. The Joint Electron Device Engineering Council ("JEDPC") is the industry organization responsible for the standards governing the most recent generations of computer memory chips. Even though JEDEC was already developing the standards for the next generation of memory chips, Intel convened a secret committee that it dubbed the Advanced DRAM Technology ("ADT") Consortium to develop a competing memory standard.

123. The ADT Consortium was cleverly structured with multiple tiers of membership, each with different levels of access to information. The majority of companies were consigned to the lowest tier, meaning that they would receive access to the memory standard only upon its completion, but not during its development. The actual development effort was undertaken by companies with the highest tier membership status, which Intel reserved for itself and the major memory manufacturers. No other companies were allowed input or full access to the standard during its development by the ADT Consortium.

124. AMD desperately needed access to the developing standard, and input into its definition, in order to be able to launch a microprocessor with updated memory controller technology at the same time as Intel. AMD lobbied repeatedly for higher tier membership status, but was continually turned down. Intel had structured the ADT Consortium's rules to require a unanimous vote -- a rule that gave Intel veto power -- over any decision to allow AMD to join the development committee; and it used that veto power to cause the Consortium arbitrarily to reject AMD's application.

125. By foreclosing AMD from input or access to the memory standard during its development process, Intel deliberately placed AMD at a severe competitive disadvantage. As a consequence of exclusion, AMD had no opportunity to monitor participants' suggestions and to object to Intel proposed features that were without substantial benefit to consumers and were instead motivated by Intel's desire to disadvantage AMD's microprocessor architecture. Furthermore, by keeping the ADT Consortium memory standard-setting process shrouded in secrecy, Intel was able to gain a significant head start. While the ADT Consortium was ultimately unsuccessful in implementing an industry standard, this type of exclusionary conduct exemplifies Intel's attempts to use industry standard-setting to competitively disadvantage AMD in an unlawfully exclusionary manner.

126. Indeed, Intel is attempting a repeat performance with respect to a new memory standard, this time excluding AMD by avoiding the open standard-setting

PKNS\381148.1

committee entirely. Intel is currently coercing the major memory producers into signing non-disclosure agreements and working exclusively with Intel in a "secret" committee to develop the next generation memory interface standard. Once under this agreement, the memory manufacturers are prohibited front sharing information about their own product designs implementing the memory interface standard. This has the effect of preventing AMD from completing the design of its processor memory controllers until Intel permits memory manufacturers to communicate their interface specifications to the industry.

127.  By this scheme, Intel tightens its control over the industry by converting what the component manufacturers intend as a public standard into a proprietary one, and thereby guarantees itself an undeserved head-start and unfair competitive advantage.

### b. Intel's Promotion of Industry Standards That Disadvantage AMD.

128.  Even where it has been unable to exclude AMD from participating in the development of industry standards, Intel has attempted to drive the adoption of standards having no substantial consumer benefit and whose sole or dominant purpose was to competitively disadvantage AMD based on its highly integrated microprocessor architecture.

129.  As an example, 2004, JEDEC began developing standards governing the design of the memory modules for next generation ("DDR3") memory devices. These modules, known as dual inline memory modules, or "DIMMS," consisted of printed circuit boards upon which a number of memory chips were mounted. The DIMMs connected the memory chips to the computer's motherboard through a series of metal connectors known as "pins." One purpose of the JEDEC standards was to define the functions of these pins so as to enable chipmakers to design compatible memory controllers that would allow their microprocessors and the memory on the DIMMs to communicate.

PKNS\381148.1

-40-

130. The JEDEC committee, which consists of members representing companies throughout the computer industry, had already adopted a scheme for defining the pins for the previous generation ("DDR2") DIMMs used in desktop and laptop computers. When the JEDEC committee began work on standards for DDR3 memory modules for desktop computer, Intel proposed that the committee adopt a pin definition similar to that used for the DDR2 memory modules. This proposal made perfect sense, as Intel explained to the committee, because it allowed DDR3 memory controllers to be compatible with DDR2 and DDR3 memory modules.

131. When the JEDEC committee began to define the pins for DDR3 laptop memory modules in this consistent manner, however, Intel completely reversed its position, counter-proposing instead that the committee rearrange the pin definitions. Intel's proposal had no discernable technical merit or basis.

132. In fact, Intel's motivation for proposing modification of the laptop memory module pin definition was to competitively disadvantage AMD. Any modification to the laptop memory module pin definition would require Intel and AMD to make corresponding modifications of their memory controllers. AMD's microprocessor design, while representing a huge breakthrough in integration, embeds the memory controller directly into its microprocessor. While this produces significant computing advantages, modification of an embedded memory controller requires significantly more time and expense.

133. Knowing this vulnerability, Intel proposed its modified DDR3 memory module pin definition for laptop computers for the purpose of delaying AMD's introduction of a technologically superior part. While Intel's proposal was ultimately rejected by the JEDEC committee, confirming the proposal's complete lack of technical merit, this is yet another example of how Intel has attempted to drive industry standards to achieve its exclusionary ends.

///

///

        c.    **Intel's Leveraging of Its Other Product Lines to Unfairly Disadvantage AMD in the Marketplace**

134. Intel has also designed and marketed microprocessor-related products with the goal of compromising performance for those who opt for AMD solutions, even if it requires sacrificing its own product quality and integrity.

135. An example is Intel's compilers. Generally, independent software vendors ("ISVs") write software programs in high-level languages, such as C, C++, or Fortran. Before these programs can be understood by a computer system, they must be translated into object code -- a machine-readable language -- by a software program called a compiler. Different companies write compilers for different operating systems (Windows, Linux, etc.) and for different programming languages (C, C++, Fortran, etc.). Intel offers compilers for use with a variety of different operating systems and programming languages.

136. Intel's compilers are designed to perform specialized types of optimizations that are particularly advantageous for ISVs developing software programs that rely heavily upon floating point or vectorized mathematical calculations. Such programs include, for example, mathematical modeling, multimedia, and video game applications.

137. Intel has designed its compiler purposely to degrade performance when a program is run on an AMD platform. To achieve this, Intel designed the compiler to compile code along several alternate code paths. Such paths are executed when the program runs on an Intel platform and others are executed when the program is operated on a computer with an AMD microprocessor. (The choice of code path is determined when the program is started, using a feature known as "CPUID" which identifies the computer's microprocessor.) By design, the code paths were not created equally. If the program detects a "Genuine Intel" microprocessor, it executes a fully optimized code path and operates with the maximum efficiency. However, if

///

the program detects an "Authentic AMD" microprocessor, it executes a different code path that will degrade the programs performance or cause it to crash.

138. ISVs are forced to choose between Intel's compilers, which degrade the performance of their software when operated with AMD microprocessors, or third-party compilers, which do not contain Intel's particular optimizations. Sadly for AMD and its customers, for legitimate reasons Intel's compilers appeal to certain groups of ISVs, especially those developing software programs that rely heavily on floating point and vectorized math calculations. Unbeknownst to them, performance of their programs is degraded when run on an AMD microprocessor not because of design deficiencies on the part of AMD, but deviousness on the part of Intel.

## EFFECTS OF INTEL'S MISCONDUCT

139. Intel's unlawful conduct has caused and continues to cause substantial harm to competition in the market for x86 microprocessor chips. But for Intel's acts, AMD and other competitors would be able to compete for microprocessor business on competitive merits giving customers and end-product consumers lower prices, enhanced innovation and greater freedom of choice. As a result of Intel's conduct as alleged herein, however, Plaintiff and the members of the Plaintiff Class have been injured in their business or property and have been forced to pay supra-competitive prices for x86 microprocessor chips and end-products and, suffered reduced innovation and restricted choices in the x86 microprocessor market.

## TOLLING OF APPLICABLE STATUTES OF LIMITATION

140. Any applicable statues of limitation have been equitably tolled by Defendant's affirmative acts of fraudulent concealment, suppression, and denial of the true facts regarding the existence of the monopolistic and anti-competitive practices at issue herein. Thus, all applicable statutes of limitations should be tolled.

///
///
///

## VIOLATIONS ALLEGED
### FIRST CLAIM FOR RELIEF
### Violations of the Cartwright Act,
### California Business & Professions Code §16720, et seq.
### (Against All Defendants)

141. Plaintiff incorporates by reference and realleges paragraphs 1 through 140 above, as fully set forth herein.

142. Beginning at a time presently unknown to plaintiff, and continuing thereafter to the present, defendant and others, including those presently unknown, entered into and engaged in a continuing unlawful trust in restraint of trade and commerce described above in violation of California Business and Professions Code section 16720.

143. The aforesaid violations of California Business and Professions Code section 16720 consisted, without limitation, of a continuing combination, trust, agreement, understanding, and concert of action among the Defendant, and others, which restrained trade and commerce in the sale or distribution of Intel x86 microprocessor chips, in California and the United States.

144. For the purpose of forming and effectuating the aforesaid unlawful trust, the Defendant and others have done those things to which they agreed, combined, and conspired as described above.

145. The aforesaid unlawful trust has had the following effects, among others, including the effects described above:

    a. Competition in the sale of x86 microprocessor chips and end-products containing such chips has been suppressed, restrained, or eliminated;

    b. Prices of x86 microprocessor chips indirectly purchased by plaintiff and other members of the Plaintiff Class including end-products have been raised, fixed, maintained, and stabilized at artificial and non-competitive levels.

146. During the period covered by this Complaint, plaintiff and the other members of the Plaintiff Class purchased x86 microprocessor chips indirectly from Intel for their own use and not for re-sale. By reason of the alleged violations of the

antitrust laws, plaintiff and other members of the Plaintiff Class paid more for x86 microprocessor chips than they would have paid in the absence of the illegal trust, have had their choices limited and, as a result, have been injured in their business and property and have suffered damages in an amount according to proof at trial.

### SECOND CLAIM FOR RELIEF
### Common Law Monopolization and Attempted Monopolization
### (Against All Defendants)

147. Plaintiff incorporates by reference and realleges paragraphs 1-146 above, as though fully set forth herein.

148. Defendant has engaged in acts and practices as described above without justification that operate to exclude competition in the x86 microprocessor chip markets and to acquire, maintain, and increase their monopoly power and attempt to acquire, maintain, and increase such monopoly power in California and the United States. Both the purpose and the effect of these acts and practices have been to restrain competition in the relevant markets for x86 microprocessor chips, thereby enabling Intel to maintain a monopoly over that market, creating a dangerous probability of successful monopolization of that market and to charge supra-competitive prices.

149. By engaging in such acts of exclusion, defendant have engaged in unlawful monopolization and attempted monopolization.

150. These exclusionary acts and practices lack legitimate business justification are not reasonably necessary to further any legitimate pro-competitive purpose, and impair competition in an unnecessarily restrictive way.

151. The defendant's exclusionary and restrictive practices described herein have caused significant harm to class members by increasing the prices they have paid for Intel x86 chips above competitive levels and by denying them a free choice in a competitive market. As a result of the exclusionary and restrictive practices it has imposed on others, including those described herein, defendant has raised and reinforced barriers to market entry so as to forestall the development of actual

competition in the relevant market. The resultant monopoly power has enabled Intel to price their x86 chips in a monopolistic fashion. OEMs and others have passed these monopoly prices on to consumers, including particularly to plaintiff and the class members.

152. As a direct and proximate result of defendant's acts of monopolization and attempted monopolization as alleged herein, plaintiff and the members of the Plaintiff Class have suffered actual damages in an amount to be proven at trial.

153. Defendant' acts of monopolization as described herein were intended to monopolize and suppress competition in the relevant markets and to injure consumers. Defendant' acts of monopolization were and included acts of fraud, malice and oppression and were done with conscious disregard of the rights upon consumers, including plaintiff and the Plaintiff Class. Accordingly, an award of punitive damages is justified in order to make an example of Defendant, to punish Defendant, and to deter Defendant, and others, from engaging in the same or similar conduct. Plaintiff, and the members of the Plaintiff Class, seeks an award of punitive damages in an amount according to proof at trial.

### THIRD CLAIM FOR RELIEF
### Violations of the Cartwright Act,
### California Business & Professions Code §16727
### (Against All Defendants)

154. Plaintiff incorporates by reference and realleges paragraphs 1-153 above, as though fully set forth herein.

155. Defendant has engaged in sales, contracts, agreements or understandings for the sale of x86 microprocessor chips for use within the California and the United States, or fixed prices charged therefore, or discounts from, or rebates upon, such prices, on the condition, agreement or understanding that the purchasers not use or deal in the x86 microprocessor chips of a competitor or competitors.

156. The effect of such exclusive dealing sales or contracts, agreements or understandings may be to substantially lessen competition or tend to create a

PKNS\381148.1

monopoly in x86 microprocessor chips within the State of California and the United States.

157. As a result of the exclusionary and restrictive practices described herein, Intel has imposed on others, raised and reinforced barriers to market entry so as to forestall the development of actual competition in the relevant market. The resultant monopoly power has enabled Intel to price their x86 microprocessor chips in a monopolistic fashion. OEMs and others have passed these monopoly prices on to consumers, including particularly to plaintiff and the class members.

158. As a direct and proximate result of defendant's acts of exclusionary and restrictive practices as alleged herein, plaintiff and the members of the Plaintiff Class have suffered injury in their business or property as plaintiff and other members of the Plaintiff Class paid more for x86 microprocessor chips than they would have paid in the absence of the such conduct and have had their choices artificially limited. Plaintiff and the members of the Plaintiff Class have thereby suffered damages in an amount according to proof at trial.

## REQUEST FOR RELIEF

WHEREFORE, plaintiffs pray:

1. This Court certify the Plaintiff Class;

2. This Court declare that defendants have engaged in combinations of capital, skill and acts with others constituting a trust for the purpose of creating or carrying out restrictions in trade or commerce, limiting and reducing the production and increasing the price of merchandise or a commodity, and preventing competition in manufacturing, making, transportation, sale or purchase of merchandise, products, or a commodity, in violation of the Cartwright Act (California Business and Professions Code section 16720 et seq.), in violation of the of the common law of monopolization, and exclusive dealing that may substantially lessen competition or tend to create a monopoly in x86 microprocessor chips within the State of California and the United States for (California Business and Professions Code section 16727);

1  3.  On the First Cause of Action (Cartwright Act – Illegal Trust): Plaintiffs and the members of the Class recover their actual damages, in an amount to be determined at trial, and said amount be trebled pursuant to California Business and Professions Code section 16750;

4.  On the Second Cause of Action (Monopolization): Plaintiffs and the members of the Class recover their actual damages, in an amount to be determined at trial, and punitive damages in an amount to be determined at trial;

5.  On the Third Cause of Action (Cartwright Act – Exclusive Dealing): Plaintiffs and the members of the Class recover their actual damages, in an amount to be determined at trial, and said amount be trebled pursuant to California Business and Professions Code section 16750;

6.  That defendants be enjoined from further acts in violation of the aforesaid;

7.  That plaintiffs and the members of the Class recover their reasonable attorneys' fees and costs of suit;

8.  That plaintiffs and the members of the Class recover pre-judgment and post-judgment interest on the above sums at the highest rate allowed by law; and

9.  That plaintiff and the members of the Class be granted such other and further relief as this Court deems to be just and equitable.

///
///
///
///
///
///
///
///
///

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

DATED: July 27, 2005

POST KIRBY NOONAN & SWEAT LLP

By: _____
Michael L. Kirby
Jonathan A. Boynton
Attorneys for PLAINTIFFS

**THE MOGIN LAW FIRM, P.C.**
Daniel J. Mogin
Lisa J. Frisella
Chad M. McManamy

Attorneys for Plaintiffs

PKNS\381148.1

-49-

CLASS ACTION COMPLAINT